828 P.2d 841

**A.W. BROWN COMPANY, INC., Complainant–Appellant on appeal,**

v.

**IDAHO POWER COMPANY, Respondent–Respondent on appeal,**

and

**Idaho Public Utilities Commission, Respondent on appeal.**

No. 18975.

Supreme Court of Idaho, Boise, January 1992 Term.

March 9, 1992.

Rehearing Denied May 5, 1992.

**2.** *J.R. Simplot Co. v. State Tax Comm'n,* 120   Idaho 849, 820 P.2d 1206 (1991).

Roden, Arkoosh & Riceci, Boise, for complainant-appellant. C. Thomas Arkoosh, argued.

Larry EchoHawk, Atty. Gen., Scott D. Woodbury, Deputy Atty. Gen., Boise, for respondent Idaho Public Utilities Com'n. Scott D. Woodbury, argued.

Evans, Keane, Koontz, Boyd, Simko & Ripley, Boise, for respondent-respondent Idaho Power Co. Barton L. Kline, argued.

BAKES, Chief Justice.

This case is an appeal from an order of the Idaho Public Utilities Commission denying appellant A.W. Brown, Inc.'s request that the PUC order Idaho Power to purchase electricity from Brown at an earlier, superseded cogeneration rate. We affirm the Commission's decision.

Section 210 of the Public Utility Regulatory Policies Act (PURPA) requires electric utilities to purchase electricity produced by cogenerators or small power producers (CSPP's) that obtain qualifying facility (QF) status under Section 201 of PURPA. Pursuant to congressional directive, the Federal Energy Regulatory Commission (FERC) implemented Sections 201 and 210 of PURPA by enacting regulations establishing the requirements and procedures for obtaining qualifying status and eligibility for rates and exemptions. Under FERC regulations, utilities are to purchase QF power at a rate equal to the utility's full avoided cost, which is the incremental cost of energy to the utility which, but for the purchase from the QF, the utility would generate itself or purchase elsewhere. FERC regulations promulgated the PURPA requirements, but left implementation of those requirements to the regulatory authorities of the individual states. 18 C.F.R. § 292.401. In response to these FERC and PURPA requirements, the Idaho Public Utilities Commission (PUC or Commission) established regulations under which Idaho utilities are to purchase power from CSPP's. The Commission also established a rule that power purchase contracts, once negotiated, be presented to the Commission for approval.

In 1983, the PUC established rates which Idaho Power was required to pay for energy bought from CSPP's, known as "200 rates."[1] In the 200 order, the PUC indicated that it intended the 200 rates to remain in effect for four years, unless there was good cause to reconsider the rate sooner. In January, 1985, Idaho Power filed an application seeking reconsideration of the 200 rates, and in May, 1985, the PUC determined that the 200 rates were no longer

reasonable and, in Order No. U–1006–248, computed new rates. ("248 rates.") In the 248–rate order, the PUC decided that "grandfather status," or the right to obtain the higher 200 rates, would be extended only to those potential CSPP's who, on or before April 29, 1985, had either already signed a contract with Idaho Power to produce and sell energy or who had filed meritorious complaints with the PUC alleging that Idaho Power had declined to enter into a contract with them and that they were otherwise entitled to sell energy at the earlier 200 rates. In a subsequent order, the Commission held "that in order to be 'meritorious' a complainant must allege and prove (1) that the project was substantially mature to the extent that would justify finding that the developer was ready, willing and able to sign a contract and (2) that the developer had actively negotiated for a contract which, but for the reluctance of the utility, would have been executed."

A.W. Brown Company, Inc. (Brown) is the developer of a small hydroelectric project, Sunshine No. 2, located on Lake Creek near Salmon, Idaho. In 1983, while researching the feasibility of the project, Brown contacted the Idaho Power Company office in Pocatello, asking about applicable rates and conditions for interconnection with Idaho Power. In response, Idaho Power sent a form letter to Brown, addressed to "Dear Potential Electricity Supplier," outlining the current rates and interconnection requirements. Brown alleged that it proceeded with the development of the Sunshine No. 2 project based upon the terms contained in this letter.

In the fall of 1984, Brown began the application process for a FERC license and, in early 1985, it began the consultation phase with the required federal agencies. In early 1985, while the 248 rate case was pending, Brown advised the PUC of the existence of its project. Brown also spoke with Mr. John Ferree, of Idaho Power, who told Brown that the project would only be entitled to the lower rate set in the 248 case, not the higher 200 rate.

---

**1.** The name denotes the Commission's Order No. U–1006–200 which established the rates.

Brown's license from FERC was finally issued in March, 1987. Brown did not file notice with FERC of its status as a QF until September 9, 1987.

On June 3, 1987, Brown filed a complaint in Seventh Judicial District Court which: (1) sought a judgment, based on federal law, requiring Idaho Power to purchase the electrical output of Sunshine No. 2 at the higher 200 rates; (2) alleged that Brown did not receive notice of the 248 case proceedings and thus was not bound by the April 29, 1985, cutoff date for 200 rate entitlement; and (3) sought damages for Idaho Power's failure to purchase power from Brown at the 200 rate. The district court dismissed the counts of the complaint seeking determination of the PURPA issues, concluding that the PUC had jurisdiction to hear those issues. The district court stated, however, that it would have jurisdiction to determine damages depending on the PUC's determination of the PURPA issues.

Brown then filed a complaint before the PUC on October 6, 1988, seeking a determination of Idaho Power's obligation under PURPA to purchase the electrical output of the Sunshine No. 2 project at the 200 rate. Idaho Power filed an answer generally denying any obligation to Brown to purchase electricity at the 200 rate. Idaho Power also moved the PUC for a prehearing order, requesting that it hear not only whether Brown was entitled to the 200 rate, but also the issue of damages, to which the PUC agreed.

The PUC conducted a hearing on all issues on August 31, 1989, and on August 22, 1990, it issued an order ruling against Brown. The Commission made various findings of fact and conclusions of law, holding that: (1) Brown was not entitled to sell energy to Idaho Power at the 200 rate because it had not, before the April 29, 1985, cutoff date, negotiated or entered into a contract with Idaho Power, nor had it filed a meritorious complaint against Idaho Power; (2) the letter sent to Brown by Idaho Power was informational only and was not an offer to contract; and (3) the Commission was not required to give

Brown formal notice of the 248 proceeding. Brown filed a petition for rehearing, which the Commission denied. Brown then filed this appeal.

Brown raises the following issues on appeal:

1. Does the PUC have authority, under federal and state law, to establish a regulatory scheme to determine whether and when a qualifying CSPP is entitled to a contract to sell energy at avoided cost rates?

2. If so, did Brown comply with the Commission's requirements before the April 29, 1985, cutoff date, such that he was entitled to sell energy to Idaho Power at the higher 200 rates?

3. Is the PUC required to comply with the Administrative Procedures Act when setting avoided cost rates, such that it was required to give Brown formal notice of the 248 rate-setting proceeding?

4. Did the PUC have jurisdiction to consider and rule on the damages issues?

■ Under Art. 5, § 9 of the Idaho Constitution, this Court has only limited jurisdiction to review decisions of the PUC. On questions of law, "[t]he review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority...." I.C. § 61–629. *See also, Idaho State Homebuilders v. Washington Water Power,* 107 Idaho 415, 418, 690 P.2d 350, 353 (1984) ("In the instant case and in cases similar to this one, the scope of review is limited to a determination of 'whether the Commission regularly pursued its authority' and whether the constitutional rights of the appellant have been violated by the Commission's action"); *Utah Power & Light v. Idaho Pub. Util. Com'n.,* 102 Idaho 282, 284, 629 P.2d 678, 680 (1981) ("This Court's scope of review on appeal in cases of this type is to determine only if the Commission regularly pursued its authority and whether the constitutional rights of the utility were violated....").

■ Regarding questions of fact, where the Commission's findings are supported by substantial, competent evidence, this

court must affirm those findings. *Empire Lumber v. Washington Water Power*, 114 Idaho 191, 193, 755 P.2d 1229, 1231 (1988) (" 'Where [the Commission's] findings are supported by competent and substantial evidence this Court is obliged to affirm its decision,' " *quoting Boise Water Corp. v. Idaho Public Utilities Comm'n*, 97 Idaho 832, 555 P.2d 163 (1976)); *Utah–Idaho Sugar Co. v. Intermountain Gas Co.*, 100 Idaho 368, 376, 597 P.2d 1058, 1066 (1979) ("In reviewing findings of fact we will sustain a Commission's determination unless it appears that the clear weight of the evidence is against its conclusion or that the evidence is strong and persuasive that the Commission abused its discretion.").

■ We first consider whether the Commission had authority to establish the requirement that, before a CSPP can lock-in a certain rate, there must be a signed contract to sell at that rate or a meritorious complaint alleging that the project was mature and that the developer had attempted, and failed, to negotiate a contract with the utility. Brown argued, before both the Commission and this Court, that the Commission was preempted by federal law from adopting such a rule and that a CSPP need only achieve qualifying status in order to obligate a utility to purchase power at the rates which existed when the developer became qualified. Thus, since Brown claims it became a QF before April 29, 1985, the established cutoff date for the 200 rates, it now argues that Idaho Power was obligated as a matter of law to buy power generated by Sunshine #2 at the 200 rate, regardless of whether Brown had a signed contract with Idaho Power or had filed a meritorious complaint. The Commission disagreed with this argument, concluding that it had authority to establish a negotiation and contract requirement pursuant to *Empire Lumber v. Washington Water Power*, 114 Idaho 191, 755 P.2d 1229 (1988) and *Afton Energy, Inc. v. Idaho Power Co.*, 107 Idaho 781, 693 P.2d 427 (1984). We agree with the Commission.

In *Empire*, this Court explained how the state was to implement PURPA:

The implementation of PURPA as it relates to co-generation and small power producers, and the regulations promulgated by FERC, have been largely left to the regulatory authorities of the individual states. PURPA, section 210(f), provides in part: "Each state regulatory [authority] shall ... implement such [FERC] rule ... for each electric utility for which it has ratemaking authority".... The Idaho Public Utilities Commission is the agency authorized and directed to supervise and regulate electrical utilities, and has ratemaking authority over such utilities. I.C. §§ 61–501, 61–129; *Grever v. Idaho Telephone Company*, 94 Idaho 900, 499 P.2d 1256 (1972). The Commission, as part of its statutory duties, determines reasonable rates and investigates and reviews contracts. I.C. §§ 61–502,–503. The Commission, also has jurisdiction to hear complaints against utilities alleging violation of any provision of law or of any order or rule of the Commission. I.C. § 61–612. *See, Afton Energy Inc. v. Idaho Power Company*, 111 Idaho 925, 729 P.2d 400 (1986). Thus, it is clear that *the Idaho Public Utilities Commission is granted authority by the Idaho statutes to, and is the appropriate forum to resolve whether a co-generator or small power producer has satisfied the criteria for "qualified facility" status, and to determine whether a regulated utility has an obligation under PURPA to purchase power from an applicant.*

114 Idaho at 192, 755 P.2d 1229 (emphasis added). *See also, Afton Energy, Inc. v. Idaho Power Co.*, 107 Idaho 781, 785, 693 P.2d 427, 431 (1984) ("FERC's regulations interpret [PURPA § 210(f)] to require that state 'implementation may consist of the issuance of regulations, an undertaking to resolve disputes between qualifying facilities and electric utilities under Subpart C, or any other action reasonably designed to implement such subpart....' ").

■ The Court in *Empire* was faced with an issue almost identical to that in this case: Whether the PUC had properly denied a CSPP request for an order requiring Washington Water Power to purchase its

power.[2] In *Empire*, the Commission had determined that the CSPP, Empire Lumber, had not filed a notice of QF status until after it had filed its complaint. The Commission dismissed Empire's complaint, determining that at no time was Empire "ready, willing and able to sign a contract with Washington Water Power." 114 Idaho at 193, 755 P.2d 1229. On appeal, this Court held that, since Empire had not begun to design or build its facility, the Commission's decision to dismiss Empire's complaint was correct. The Court stated:

We deem it clear that the intent of PURPA is not to require an electric utility company to enter into a contract to purchase electrical power from an entity which in essence only desires to obtain an option to sell some amount of electrical power to be generated at some plant of unknown size or capacity. Such an entity must first become a QF, and in the instant case any concrete facts relating to the proposed generation facility were not known by Washington Water Power during the negotiation process, and such facts, as were defined, became known only following the filing of the complaint with the Idaho Public Utilities Commission.

114 Idaho at 194, 755 P.2d 1229. In this case, the Commission followed this language from *Empire*, concluding, for several reasons, that Brown was not entitled to sell its energy to Idaho Power at the 200 rate.

First, as *Empire* makes clear, a CSPP "must first become a QF" before it is entitled to a contract, a condition Brown did not fulfill in this case. Although Brown alleges that it had qualifying status before the cutoff date, it did not file a notice of such status until September 9, 1987, several months after it filed this action in district court on May 20, 1987, and more than two years after the cutoff date for the 200 rates. Furthermore, the question of whether Brown was a QF is not determinative in this case because, as the Commission correctly concluded, Brown was not

entitled to sell energy to Idaho Power at the 200 rate since it had not fulfilled the requirements of the Commission's regulatory scheme before April 29, 1985. The Commission fully explained those requirements as follows:

The QF must be able to exhibit that it has laid a proper foundation entitling it to contract consideration and the current avoided cost rates. There must be an indication that the QF pursued a power contract with some diligence.... Indeed, this Commission has stated a CSPP is not entitled to contract rates until it is ready, willing and able to sign a contract. It must show that but for the actions of the utility it was otherwise entitled to a contract. In most cases this will entail making a comprehensive binding offer showing with reasonable specificity, design and size characteristics and indicating a willingness to rely on proposed contract terms and proceed thereunder.

Applying this criteria, the Commission concluded that Brown had "not demonstrated that it met the Commission prerequisite of substantive negotiation. It is difficult to characterize its initial discussions with Idaho Power in 1983 as anything other than preliminary, tentative or general." Indeed, as the Commission pointed out, after Brown's initial inquiry of Idaho Power, in 1983, as to the applicable rates and interconnection requirements, Brown made no more contact with the utility until 1985, after the 248 case had been filed. It certainly did not "pursue a power contract with some diligence," nor did it ever make "a comprehensive binding offer." Clearly, Brown did not show that it was "ready, willing, and able to sign a contract" while the 200 rates were in effect. Accordingly, it failed to meet the Commission's "grandfathering" requirements for a 200 rate, *i.e.*, that a CSPP either had signed a contract with Idaho Power before April 29, 1985, or had filed a meritorious complaint with the PUC before that date.

---

2. In this case, the precise issue is not whether Brown is entitled to a contract to sell energy to Idaho Power—it clearly is, as it has received qualifying status—but, rather, the issue is the rate at which Brown is entitled to sell its energy.

818

Brown argues that a "legally enforceable obligation" arose when it began to develop its plant pursuant to the terms of the "Dear Potential Electricity Supplier" letter, which Brown attempts to characterize as an unconditional offer to contract. The Commission concluded, however, that "the letter was not intended, and could not be reasonably construed, as a binding commitment on the part of Idaho Power to purchase energy." This finding is supported by the letter itself and by Idaho Power testimony which described it as "a generic form letter" which only provided information detailing the application process.

The Commission viewed as highly significant the fact that, although Brown argued that Idaho Power was legally obligated to purchase power at the 200 rates (either when Brown accepted the offer to contract allegedly contained in the letter or when Brown became a QF), Brown, on the other hand, never made a reciprocal commitment to sell that power. As the Commission explained:

> Taken together, the implementing regulations and comments appear to mean that *a qualifying facility is entitled to receive avoided cost rates if it obligates itself to the delivery of energy* or capacity and if that obligation is legally enforceable against the qualifying facility. *This is the essence of the relationship between a qualifying facility and the utility: the utility must pay avoided cost rates, but in return the utility is entitled to know that the facility is obligated to deliver capacity and energy and that the obligation is legally enforceable.* On the facts of this case, we can think of no theory of law which

would have entitled Idaho Power Company to successfully compel Brown to provide energy or to recover damages for his failure to do so. *Brown never obligated himself to do anything.*[3] (Emphasis added.)

Brown's theory, that a CSPP is entitled to lock-in a rate as soon as it reaches qualified status, is contrary to our decisions in *Empire* and *Afton, supra.* As the Commission reasoned, "a project developer could lock in a rate in the year of its QF certification, but not begin producing power for several years after, by which time utility avoided costs may well have declined. In this circumstance the ratepayer would be paying more than the utility avoided cost," which would be in direct violation of PURPA policies. We conclude that the Commission did not err in holding that Brown did not comply with its regulatory scheme to qualify for the 200 rate.

Brown further argues that the 248 rates cannot apply because the Commission did not give formal notice of the 248 ratemaking proceeding, as required by the Administrative Procedures Act (APA), I.C. § 67–5201 *et seq.* The Commission held that it was not required to give Brown such notice, concluding that its ratemaking procedure is legislative, not adjudicative, in nature, and as such, Brown had no right to participate in or receive formal notice of the proceedings. Again, we agree with the Commission's conclusion.

■ First, the record indicates that Brown did receive actual notice of the 248 rate case proceeding, pursuant to a telephone conversation with John Ferree of Idaho Power on February 28, 1985. There-

3. Brown testified at the hearing before the Commission as follows:

Q My question is, is it a two-way contract, Mr. Brown? You told me Idaho Power was obligated in 1983 to buy your power. Were you obligated to sell power to Idaho Power in 1983?
A Not in 1983, no.
Q How did you then become obligated?
A When I became a QF and set out to, and bought the property and set out to do it.
Q Well, let me ask you another question. What if—assume that the 248 rates, the ones that had come out after you'd commenced the project had been higher than the 200 case

rates, is it your understanding that your contract with Idaho Power would require you to take the lower 200 rates?
A I did not consider that—
Q No, I'm not asking what you considered at the time. This is a hypothetical, I'm asking you to assume a set of facts.
A I don't know.
Q You haven't thought about that?
A No.
Q But you are confident and positive that Idaho Power had the obligation to buy in 1983. You're not sure whether you had any reciprocal obligation; is that your testimony?
A I think that's right.

fore, Brown has no factual basis for arguing lack of notice. Furthermore, even assuming that Brown did not receive notice of the 248 proceeding, as the PUC pointed out, in Idaho, "[t]he function of rate making is legislative and not judicial. The commission as the agency of the legislative department of government exercises delegated legislative power to make rates." *Petition of Mountain States Telephone & Tel. Co.*, 76 Idaho 474, 480, 284 P.2d 681, 683 (1955). *See also, Grindstone Butte Mut. Canal Co. v. Idaho Power Co.*, 98 Idaho 860, 574 P.2d 902 (1978). The APA specifically does not apply to "those in the legislative or judicial branch." I.C. § 67-5201. Therefore, when the Commission is engaged in a legislative function, such as rate-setting, it need not act pursuant to the APA, but need only fulfill the notice requirements imposed on it by the public utility regulation statutes. I.C. § 61-307 provides, among other things, that a rate may not be changed without thirty days notice to the public. In this case, the PUC issued a notice of the 248 rate proceeding on February 8, 1985, and did not issue its order implementing the 248 rates until May 8, 1985, well beyond the 30-day notice period. There is no merit to Brown's claim of lack of notice.[4]

Finally, Brown argues that the PUC had no jurisdiction "to litigate the common law contract issues between Brown and Idaho Power that neither party had even pleaded." We disagree. Regarding whether Brown either had or was entitled to a contract with Idaho Power, this Court stated in *Empire Lumber, supra*, that the Commission "has jurisdiction to hear complaints against utilities alleging violation of any provision of law ... and is the appropriate forum to ... determine whether a regulated utility has an obligation under PURPA to purchase power from an applicant." 114 Idaho at 192, 755 P.2d 1229. This is precisely what the PUC did in this case—it heard Brown's complaint against Idaho Power alleging that it unlawfully refused to purchase power at the 200 rates, and it made a determination that Idaho

Power had no such obligation. In making this determination, the Commission had to, of necessity, determine whether Idaho Power had acted in such a manner that it became obligated to purchase power at the 200 rates. Furthermore, the Commission's finding that Idaho Power was not legally obligated to purchase power from Brown at the 200 rates renders moot the necessity to resolve any damages claim. Since Idaho Power was under no obligation to purchase, it cannot be responsible for any claimed damages resulting from Brown's inability to sell at the 200 rates.

The order of the Idaho Public Utilities Commission is affirmed. Costs to respondent. No attorney fees allowed.

BISTLINE, JOHNSON and McDEVITT, JJ., and WALTERS, J. pro tem., concur.

---

4. Brown's claim would likely be unavailing in any event because the 200 rate was set by the same notice process.