**MID–SOUTH COGENERATION, INC., Plaintiff,**

v.

**TENNESSEE VALLEY AUTHORITY, Defendant.**

No. 3:94–cv–283.

E.D. Tennessee, Northern Division.

March 18, 1996.

Jeffrey S. Bivins, Boult, Cummings, Conners & Berry, Nashville, TN, for plaintiff.

Robert C. Glinski, Harriett A. Cooper, and Thomas C. Doolan, Tennessee Valley Authority, Office of General Counsel, Knoxville, TN, for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JORDAN, District Judge.

This civil action came on for trial without a jury beginning on Tuesday, December 4, 1995. At the time of trial, the court had under advisement the defendant's motion for summary judgment [doc. 12]. The court has considered the evidentiary material filed in support of and in opposition to this motion for summary judgment together with the evidence adduced at trial. The following are the court's findings of fact and conclusions of law rendered under Fed.R.Civ.P. 52(a).

The plaintiff states three theories of recovery in its complaint. First, it claims that it is entitled to relief under the Public Utility Regulatory Policies Act of 1978 (PURPA), and specifically under 16 U.S.C. § 824a–3. The statute, in § 824a–3(a) and (b), requires electric utilities, like the defendant Tennessee Valley Authority (TVA), to purchase electric energy from qualifying small power production facilities and qualifying cogeneration facilities at non-discriminatory rates based on the purchasing utilities' avoided costs. The term "avoided cost" is an abbreviated reference to "incremental cost of alternative electric energy," which is defined in § 824a–3(d) to mean "the cost to the electric utility of the electric energy which, but for the purchase from such cogenerator or small power producer, such utility would generate or purchase from another source."

The plaintiff's second theory of recovery is based on its allegation that it had a contract with the defendant TVA under which TVA agreed to purchase electric energy from the plaintiff at certain rates. The plaintiff says that the defendant breached this contract. The third theory of recovery is that the defendant caused the plaintiff to incur damages by misrepresentation.

The exhibits attached to the plaintiff's complaint, read with the complaint, show or suggest many of the pertinent facts in this case. Its principals formed the plaintiff, Mid–South Cogeneration, Inc. (Mid–South), to take advantage of business opportunities in the southeastern United States in the operation of wood-waste cogeneration facilities and small power production facilities. The power production facility (the Clinch River facility) which is a subject of this litigation came to Mid–South's attention via a television news broadcast. The plaintiff developed a business plan to purchase the facility from a bankruptcy estate, to operate it to sell electric energy to TVA directly or through TVA's local distributor, the Harriman Utility Board, and to operate it also to sell steam to an adjacent paper plant.

Mid–South inquired of TVA about assuming the obligations of the prior owner of this power production facility under an existing cogeneration agreement, dating from 1982. TVA responded in an April 25, 1991, letter, exhibit A to the complaint filed in this civil action. TVA rejected any proposal of an assumption of the existing cogeneration agreement, in part because Mid–South proposed an amount of output greater than that provided for by the existing agreement. The proposal of greater output from the Clinch River facility created a need, in TVA's view, to reexamine the electrical facilities at the Clinch River facility, to ensure the safety of any connection of this facility to TVA's electric energy transmission system.

This April 25, 1991, letter is important for its discussion of the rates which TVA might pay for Mid–South's output at this facility:

> Based on the information provided, the facility you describe would be eligible for new purchase arrangements under the current Dispersed Power Production Guidelines for purchase of up to 17,500 kW of power from the wood-waste-fired facility. In order for purchases to be made under Part C of the Dispersed Power Price Schedule CSPP (or comparable provisions of any replacement standard price schedule that might then be applicable) the contract term would need to be at least 10 years. The purchase prices for fiscal year 1991 under Part C are shown on the enclosed schedule.

> The facility may qualify for other purchase arrangements involving fixed prices or levelized prices for a portion of the contract term. Prices under these arrangements

would be based on TVA's projected avoided costs over the contract term.

It is clear from this letter that as of April 25, 1991, no enforceable agreement existed between these parties.

The different pricing schemes for electric energy purchased under PURPA in effect at the time of this April 1991 letter were explained in TVA's modified Dispersed Power Production Guidelines and Dispersed Power Price Schedule CSPP, published in the Federal Register on April 30, 1984 [see doc. 13, ex. A]. Part C of the price schedule provided for a rate of 2.420 cents per kWh for onpeak kilowatthours, and for a rate of 1.750 cents per kWh for offpeak kilowatthours. It was noted in the price schedule that the differential for onpeak kilowatt hours was based in part on long-term projections of capacity cost savings; this was at least part of the reason why Part C pricing was available only for purchases of energy under contracts having terms of 10 years or longer. Put simply, TVA could afford to pay better rates under Part C because long-term contracts for electric energy enabled TVA to avoid construction and other costs associated with increasing the capacity of its system to meet long-term projected needs.

Both the guidelines and the price schedule made it clear that the Part C rates were subject to annual adjustment for changed projections of avoided energy costs and of avoided capacity costs, and were subject also to adjustment, modification, or change due to changing conditions on the TVA power system, and other power supply considerations. The guidelines provided that in an individual case, the amounts payable might be modified to reflect costs, such as administrative costs, metering costs, and transmission line losses, incurred by the TVA electric system because of purchasing from a qualified producer under the Dispersed Power Production Guidelines.

Fixed rates for the purchase of energy over a portion of the life of a purchase contract obviously provided greater financial security to the cogenerator or small power producer. Levelized rates provided less certainty than fixed rates, but protected the cogenerator or producer to some extent from fluctuations in avoided costs determined under PURPA and applicable regulations.

Mid–South's application to the Federal Energy Regulatory Commission (FERC) for self-certification as a qualifying small power production facility, a certified copy of which is attached to the defendant TVA's motion for summary judgment, is dated December 30, 1991, and shows that it was docketed by the commission on December 30, 1992. Therefore, while the plaintiff was negotiating with the defendant concerning the terms under which the defendant might purchase energy from the Clinch River facility, Mid–South was not, at least technically, a qualified facility for the purposes of PURPA.

While the parties continued to negotiate, on February 21, 1992, TVA published in the Federal Register further modifications of the Dispersed Power Production Guidelines, effective September 10, 1991. These modifications included a new Dispersed Power Price Schedule CSPP, effective November 1, 1991, from which Part C was eliminated. The elimination of Part C pricing was justified in the summary which precedes the guidelines published in the Federal Register:

> The CSPP Schedule currently reflects avoided energy costs but no avoided capacity costs since the generating units scheduled to come on line will cover our capacity needs into the next decade. In the future, TVA's capacity needs and the best available options to meet those needs will be determined through the TVA's integrated resource planning efforts.

The standard prices stated in this Dispersed Power Price Schedule CSPP are lower than those offered in Part C of the earlier schedule.

On April 26, 1991, one day after the date of the TVA letter referred to above, Mark Justus, the president of Mid–South, appeared in a bankruptcy court in Cincinnati, Ohio, in support of Mid–South's bid to purchase the Clinch River facility from the bankruptcy estate of Clinch River Corporation. In his testimony in the bankruptcy court [a copy of a partial transcript is exhibit 1 to doc. 15 filed in this civil action], Mr. Justus recognized that Mid–South did not have a fixed-

price or other contract with TVA for the purchase of energy from the Clinch River facility:

> Under ... PURPA, ... any plant that produces power from the use of nuclear energy such as wind or from a source such as biomass, the prevailing utility is required to purchase power from the utility board at cost.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> TVA does not negotiate separate rates or separate costs for any contract. It is a standard, avoided cost rate or disbursed (sic: dispersed) power production rate that is standard throughout the TVA. So we receive the same rate as we receive in any other area of TVA. The only difference might be the amount of power. Producing it might be advantageous to—We might get a higher rate. But there is an amendment. We are aware of it, and we're willing to accept that.

The court interprets this testimony to mean that at least as of April 26, 1991, the plaintiff was contemplating accepting the business risk of dealing with TVA on the basis of Part C or another price schedule subject to periodic modification. The PURPA definition of "incremental cost of alternative electric energy," 16 U.S.C. § 824a–3(d), contemplates that cogenerators' and small power producers' earnings will vary with purchasing utilities' avoided costs.

Much of the parties' controversy in this civil action centers on a meeting which took place on May 16, 1991, among Mark Justus, the president of Mid–South, James F. Stair, II, a consultant to Mid–South, and Sam Powell, a representative of TVA, since retired. The participants' recollections of this meeting differ somewhat. The plaintiff argues that the outcome of this meeting was a fixed-price contract under which TVA would purchase electric energy from Mid–South for a 20–year term, with the rates being fixed for the first 12 years of the life of the contract. TVA argues that Mr. Powell merely exhibited to the others at the meeting the rates then projected under the Part C price schedule in effect at that time. There is no dispute that Mr. Powell did not deliver a copy of this rate schedule to the others at the meeting, and that a written contract was not entered into at the conclusion of the meeting.

Mr. Justus' understanding of this meeting is that TVA offered to purchase electric energy from Mid–South under the terms of a cogeneration agreement similar to a sample agreement which Mr. Powell had supplied to him earlier, for fixed rates over 12 years of a 20–year term. While the parties referred liberally to Part C in their testimony concerning the May 1991 meeting and other negotiations between these parties, it is the plaintiff's contention that what Mr. Powell exhibited to Mr. Justus and Mr. Stair at the May 1991 meeting was a schedule of rates based on a projection of what Part C rates might be in the future, but, unlike Part C itself, with fixed rates, not subject to annual modification. Mr. Justus recalls that he reported these rates by facsimile transmission to John T. Dugger, Jr., an investor in Mid–South, with the comment that the rates were lower than those used in another project with which the Mid–South principals were familiar, the Burkesville project. It is the contention of the plaintiff, however, that this schedule of rates exhibited by Mr. Powell provided profitability for the Clinch River facility.

Mr. Powell's recollection is that the plaintiff wanted a contract with Part C pricing. Later, when TVA eliminated Part C from the Dispersed Power Price Schedule CSPP, Mr. Powell believed that the plaintiff wanted something similar to Part C pricing, with rates sufficient to allow the plaintiff to recoup its investment in the Clinch River facility, and to make a profit.

The course of the parties' negotiations after May 1991 sheds light on their intentions. In October 1991, Mid–South was still negotiating with the Harriman Utilities Board concerning the technical aspects of connecting with the board's transmission facilities; no interconnect agreement existed earlier than December 1991. This connection was essential to supplying energy to TVA. By December 1991, TVA had provided a proposed contract to Mid–South, although apparently with no purchase price schedule attached, and Mid–South was asking for revisions to the proposed contract.

In February 1992, Mary Sharpe Hayes of TVA wrote to Mr. Dugger, the investor in Mid–South, indicating her understanding that Mid–South had requested Part C pricing. Ms. Hayes noted that Part C had been eliminated from the schedule, and that TVA was not obligated under PURPA to pay more than its avoided costs, but stated that TVA was willing "to identify other benefits offered by the [Clinch River] project that [TVA] could reward to offset the investment Mid–South has already made in the project." In her letter, Ms. Hayes offered Part B pricing plus specific adders for onpeak kilowatthours for each year from 1992 through the first 10 months of 2000, but subject to specific repayment obligations if the contract were terminated before 2001.

In 1992, according to Mr. Justus, the plaintiff contemplated several options, including the Part B pricing plus adders, accepting a lump sum payment to "buy out our contract," accepting payment not to generate energy, and "wheeling" energy through TVA to other utilities. By June 1992, the parties' discussion centered on a two-contract arrangement, under which some of Mid–South's output from the Clinch River facility would be "wheeled" by TVA, and the defendant would purchase excess output from the plaintiff. In a June 10, 1992, letter, David B. Lamb of TVA offered a contract for wheeling, with an obligation on the part of the plaintiff to pay a facilities rental charge, and another contract under which TVA would purchase excess output at the rates stated in Ms. Hayes' letter, with a five-year term, subject to renewal for successive annual terms after the first five years. As late as November 1992, the plaintiff's counsel was proposing revisions to a written contract proposed by TVA.

The plaintiff has not pointed to any representation by which another officer or representative of TVA clothed Mr. Powell with real or apparent authority to negotiate a

final, binding contract between these parties. Mr. Justus testified as to his "understanding" concerning Mr. Powell's authority, but this cannot, standing alone, prove actual or apparent authority. Mr. Stair, who attended the May 1991 meeting with Mr. Justus and Mr. Powell, did not find unusual the fact that Mr. Powell kept the written rate schedule which he showed to Mr. Justus, in part because Mr. Stair assumed that Mr. Powell had to obtain approval of the rate schedule from someone else. It is clear from the material attached as exhibits to the affidavit of Jimmy L. Cross, TVA's Vice President of System Planning, filed in this civil action [doc. 13] that the defendant's internal instructions and administrative code required that the contract which the plaintiff desired be reduced to writing and approved by either TVA's board of directors or, at a minimum, its Power Group.

The court resolves the conflicts in the evidence, and the parties' conflicts concerning the inferences to be drawn from the evidence, as follows. The plaintiff proceeded with the purchase of the Clinch River facility from the bankruptcy estate of Clinch River Corporation without any reliance on any representation that TVA would enter into a fixed-price contract with the plaintiff. This is consistent with the plaintiff's allegation in paragraph 9 of its original complaint filed in this civil action that *"[i]n reliance upon the Part C power purchase price schedule* provided by TVA in its April 25, 1991 letter, Mid–South proceeded with its offer to purchase from the Clinch River bankruptcy estate the land and equipment to be used in *developing its cogeneration plant."* (Emphasis added.) The Part C power purchase price schedule was part of the Dispersed Power Production Guidelines, which warned clearly of the risk that the Part C rates could change from year to year.[1] Furthermore,

---

1. In his deposition taken in this civil action, a transcript of which the plaintiff filed as its exhibit 23, Larry Howard, a consultant who brought together the principals in Mid–South, testified that "the reason that the transfer [of the Clinch River facility from the bankruptcy estate to Mid–South] was approved by everybody, including the Court and including Mid–South and including Chase, was that T.V.A.'s *published rates* for a

long-term power purchase that was in effect at the time of the Court approval of the sale was the one that would prevail and establish the prices of the contract given to Mid–South." *Deposition of Larry Howard*, Oct. 13, 1995, at 35–36 (emphasis added).

As the court has indicated at several places in this memorandum opinion, any belief that a contract with Part C pricing "locked in" rates to be

when Mr. Justus of the plaintiff received TVA's April 25, 1991, letter just before the bankruptcy court hearing concerning the plaintiff's offer to purchase the Clinch River facility, Mr. Justus contacted TVA's Office of the General Counsel, but obtained nothing more than oral confirmation that a wood-burning power production facility would qualify as a small power producer under PURPA. In this regard, the court finds, the defendant made no misrepresentation to the plaintiff.

The court also finds, again resolving disputes in the testimony, that at the May 16, 1991, meeting, Mr. Powell, on behalf of TVA, proposed a contract with Part C pricing, and that no binding contract was formed that day. This is consistent with the evidence that Mr. Powell exhibited to the others at the meeting, but did not give to them, a schedule of rates. By exhibiting this schedule, TVA, through Mr. Powell, was advising the plaintiff of TVA's then-present projections of Part C rates in future, successive years, without relinquishing its rights to change the Part C rates payable in any given year, and to change its projections of such rates in future years. The parties recognized that knowing the projected rates was important to their negotiations, for disclosure of the projected rates provided the plaintiff with more knowledge on the basis of which to assess the potential profitability of the project. Mr. Justus conceded at trial that at the May 1991 meeting, Mr. Powell stated, "We don't let these numbers out until they're in a contract," indicating that no contract was formed at that meeting.

The plaintiff did not obtain a binding agreement at the May 16, 1991, meeting, and could not reasonably have believed that it had. The position of the plaintiff that Mr. Powell allowed Mr. Justus to copy the pro-

jected rate schedule and to send copies of it by facsimile transmission to others financially interested in the plaintiff, and that this establishes the intention of Mr. Powell and of TVA to be bound by this schedule of projected rates as the foundation of a fixed-price contract (in effect binding TVA to its own projections as they existed at that time) is undercut by the plaintiff's failure to produce at trial any copy of the schedule alleged to have been sent by facsimile transmission.[2] It is not credible that the plaintiff reasonably believed that it had entered into a fixed-price contract on May 16, 1991, but did not preserve a copy of the document which provided the price terms of this alleged contract.

Mr. Powell explained adequately, in the view of the court, that he was mistaken or confused when he testified during his pretrial deposition that a Part C contract could not have a term longer than 10 years. The Dispersed Power Production Guidelines in effect in May 1991 provided expressly that Part C pricing was available only for purchases under contracts having terms of 10 years or longer. Mr. Powell understood this when the parties discussed their proposed contract in 1991, and made no misrepresentation to the contrary. There is thus no inconsistency between Mr. Powell's belief that Mid–South wanted Part C pricing and his work on obtaining a draft of a 20–year contract following the May 1991 meeting.

The court finds nothing sinister in the fact that while work continued during the summer of 1991 on the project and on the proposed contract, Mr. Powell did not advise the plaintiff that TVA's revised capacity projections might lead to the elimination of Part C from the Dispersed Power Production Guidelines. The elimination of Part C was a mat-

paid in the future could not have survived an attentive reading of the published Dispersed Power Production Guidelines and Dispersed Power Price Schedule CSPP.

**2.** At trial, the court admitted for identification only the plaintiff's exhibit 9, which is a schedule of rates for 1993 through 2002, compiled later, in 1992, by John T. Dugger, Jr., of the plaintiff, from memory. The plaintiff produced no direct evidence of the document which, it is contended, Mr. Justus sent by facsimile transmission during the May 16, 1991, meeting.

Mr. Powell identified the defendant's exhibit 5 as the schedule which he took to this meeting. This schedule is entitled in part "MEDIUM FORECAST," which is consistent with the defendant's characterization of it as a projection of rates which might be paid for energy purchases in the future, calculated on the basis of incremental costs of alternative electric energy, *i.e.*, avoided costs, subject to recalculation from period to period.

ter for consideration by TVA's board of directors, not by Mr. Powell. The court finds, resolving a dispute in the testimony, that Mr. Powell had no authority to promise that a potential cogenerator or small power producer might be "grandfathered" with respect to Part C pricing, and that he made no such promise to Mid–South.[3]

Also consistent with the defendant's view of the case is the fact that in December 1991, after Mr. Powell had sent to Mid–South a draft of a proposed contract, and after the elimination of Part C from the guidelines, Mr. Justus wrote back to Mr. Powell to "accept" the contract "except for" some proposed revisions, including in his letter a statement that "[r]eference to attached schedules are not applicable unless a addendum or new rate schedule is attached to the contract since [Mid–South] has not received a new proposed rate." There is no protest in Mr. Justus' letter to the effect that the parties already had an enforceable agreement for fixed-price purchases or for purchases of power under the former Part C. At trial, Mr. Justus admitted that he understood from Mr. Powell early in the discussions that it could take one to three years to obtain a final contract incorporating negotiated rates. The court finds that when the plaintiff moved forward on acquiring the Clinch River facility and outfitting it in accordance with the plaintiff's business plan, Mid–South was relying on its own assumptions about the availability of a financially favorable contract with TVA and the amount of time it would take to conclude such a contract, and not on any misrepresentation or promise made by Mr. Powell or by anyone else associated with TVA.[4] Furthermore, as Thomas G. Wainwright, one of Mid–South's principals, testified, even when the rates exhibited at the

May 1991 meeting appeared lower than what the plaintiff had anticipated, Mid–South's principals felt encouraged to go forward by the fact that the existence of the facility at the Clinch River site made it possible to accomplish the plaintiff's business plan with lower-than-usual investments of time and money.

The court further finds that the plaintiff's asserted belief that it entered into a binding contract with the defendant early in the parties' negotiations is due at least in part to the plaintiff's principals' misunderstanding of the applicable guidelines. Mid–South's technical consultant, James Frederick Stair, for example, testified that when he heard Part C discussed at the May 1991 meeting, he was under the impression that Part C covered contracts with fixed prices and levelized prices.

In November 1991, after the elimination of Part C pricing from the Dispersed Power Production Guidelines, the parties met, and TVA offered to attempt to develop a rate schedule which would be financially more favorable to Mid–South than Part A or Part B pricing, by taking into account other benefits, apart from saved generating capacity[5], which might be provided by the Clinch River facility. There was discussion of environmental and employment benefits which the facility might provide to its region, but no one protested on behalf of the plaintiff at the meeting at which these matters were discussed that there was already in existence a fixed-price contract between these parties. The same is true with respect to Mid–South's November 12, 1991, letter sent to TVA after this meeting.

Delay in establishing a formal relationship between these parties under PURPA was not

3. The plaintiff's principals might have misconstrued as a promise to "grandfather" Mid–South under the eliminated Part C the defendant's attempts to work out a justification for paying to the plaintiff rates more favorable than those stated in Part B of the revised price schedule.

4. Mr. Dugger's testimony about the decision to proceed in accordance with the plaintiff's business plan after the May 1991 meeting proved nothing about reliance on any representation made by TVA, since Mr. Dugger did not attend the meeting, and relied solely on Mr. Justus'

report to him concerning the meeting for knowledge of TVA's positions expressed during the parties' discussions.

5. The evidence shows that TVA eliminated Part C from the Dispersed Power Production Guidelines when it appeared that one or more nuclear power plants scheduled to come on line in the near future would meet the TVA system's projected capacity needs for some time, and when fuel prices, and therefore the cost of generating electric energy using such fuel, declined.

due entirely to delay on the part of the defendant in drafting a written agreement, and was not due entirely to TVA's exercise of its right to modify its PURPA guidelines and price schedule. After the parties discussed the Clinch River project initially, and while Mr. Powell was at work on a draft of a contract, Mid–South requested inclusion in the contract of a standby power provision, under which TVA would commit to provide a certain amount of electric energy to Mid–South as needed. This added some complexity to the proposed contract, in that Mid–South, unlike, for example, some cogenerators, did not plan to engage in manufacturing while selling excess energy under PURPA; the intention was that the Clinch River facility would be used for no other purposes than to generate electric energy for sale under PURPA and to generate steam to be sold to a nearby paper mill. A standby power provision, therefore, would have required TVA to dedicate some capacity to some degree to the generation of standby power for the plaintiff, possibly affecting the PURPA calculation of capacity saved by the existence of a small power production facility at the Clinch River site.

The plaintiff experienced unexpected construction difficulties, having to fire two general contractors in succession, and experiencing an explosion and fire. The plaintiff also experienced delays in negotiating with the Harriman Utility Board the technical details concerning connection of the Clinch River facility to the board's system, which was necessary to any delivery of electric energy by the plaintiff to the defendant. In the summer of 1991, Mid–South suffered damage to a turbine while it was in transit. In September 1991, the plaintiff decided to change the mix of fuels which it would burn to generate electric energy, requiring some alteration or reconfiguration of the facility.

It is a fair summary of the evidence to state that the plaintiff experienced start-up costs and delays well beyond what its business plan projected. Mr. Stair, the technical consultant, testified that when he ceased to work on this project, it would have taken two weeks' work to connect the Clinch River facility to the Harriman Utility Board's system, a month's work to be ready to produce steam, and an additional month's work to be ready to generate electric energy. Mr. Justus conceded at trial that by 1992, the Clinch River facility was still not capable of generating 17,500 kW of power.

The plaintiff points to a January 23, 1992, TVA memorandum written by David B. Lamb, the marketing director to whom Mr. Powell, as the cogeneration development staff, reported. In this memorandum, Mr. Lamb recommended a modified Part B price schedule which, by using on-peak adders, would have provided Mid–South with prices above the plaintiff's projected average costs beginning in 1995 (assuming the accuracy of the then-current projections of Part B prices). In referring to this delay in profitability under this proposed price schedule, Mr. Lamb noted in his memorandum that "however, the projected rates for the *10–year fixed price arrangement* they were given last May for consideration had prices below the 2.5 cent level until after 1993." (Emphasis added.) The plaintiff points also to the testimony of Raymond George Tessemer, Jr., a former TVA employee, that in June 1991, Mr. Lamb informed Mr. Tessemer that TVA had delivered to Mid–South firm prices for the first 10 years of a 20–year contract, and that Mr. Powell was drafting a written contract in accordance with this.

While Mr. Lamb's later reference to a fixed-price arrangement lends some support to the plaintiff's view of what was decided at the May 1991 meeting, and while Mr. Lamb's use in his memorandum of the term "fixed-price" was not explained well at trial, the preponderance of the evidence, the court finds, weighs against a conclusion that the parties negotiated a fixed-price contract at that meeting. The court credits Mr. Powell's testimony that he understood that Mid–South wanted Part C pricing, and credits Mr. Lamb's testimony that this is what Mr. Powell reported to Mr. Lamb after the May 1991 meeting. This testimony is consistent with the other evidence in the record. TVA's Table 34, the forecast of Part C rates referred to in footnote 2, *supra*, was not published, and was used as a basis for negotiation only. TVA's internal rules required

approval by its board of directors of any contract for the purchase or sale of energy, of any contract the performance of which would require a capital expenditure, and of any dispersed power production agreement. Mr. Powell's written job description included no authority to bind TVA to a contract.

A long-term contract with fixed or levelized prices, because it was to some degree a purchase of capacity, required greater assurance that the cogenerator or small power producer would operate reliably during the term of the contract, and required increased investigation of the operational characteristics of the facility in question.[6] TVA's Small Power Group never created a schedule of fixed prices pertaining to the Clinch River facility. It was never known when the Clinch River facility would begin to generate electric energy, an item of information essential to the creation of a schedule of fixed rates. When TVA corresponded with cogenerators and small power producers which had contracts with fixed or levelized rates, to advise them of the elimination of the capacity component from rate calculations, it did not so correspond with Mid–South, because of the understanding of TVA personnel that the plaintiff had opted for Part C pricing.

Mr. Tessemer, called as a witness by the plaintiff, testified on cross-examination that in the case of Mid–South, TVA did not during his tenure perform any analysis of the Clinch River facility's operational characteristics in preparation for a fixed-price contract. Mr. Tessemer conceded that official TVA policy is that no agreement exists until the execution of a written contract, and conceded that he and Mr. Powell were not authorized to enter into a contract on behalf of TVA.

On the basis of these findings of fact, the court states its conclusions of law as follows. TVA did not violate PURPA in any manner so as to give Mid–South a claim for relief under the act. PURPA, in 16 U.S.C.

§ 824a–3(a), requires FERC to prescribe rules to require electric utilities to purchase electric energy for resale from qualifying cogeneration facilities and qualifying small power production facilities. In § 824a–3(b), it is provided that no such rule promulgated by FERC "shall provide for a rate which exceeds the incremental cost to the electric utility of alternative electric energy." It follows that this court, under the guise of enforcing PURPA, may not require a utility subject to the act, such as TVA, to purchase electric energy from an entity such as Mid–South at a rate or rates in excess of the utility's avoided costs, absent an enforceable contract to purchase energy at an agreed rate or rates. The plaintiff did not seek to prove in this litigation that TVA's rates published in the Dispersed Power Price Schedule CSPP are not consistent with its avoided costs determined under PURPA and the applicable FERC regulations, or that the elimination of Part C from the price schedule did not result from a legitimate recalculation of the projected capacity needs of the defendant's system. The evidence establishes that TVA remains willing to purchase electric energy from Mid–South at a rate or rates consonant with the defendant's incremental costs of alternative electric energy, but that such a rate or rates, in the current market, and taking into consideration Mid–South's start-up costs to date, would not provide a measure of profitability acceptable to the plaintiff.

Furthermore, Mid–South has no claim for relief under PURPA in this civil action because Mid–South was never ready, willing, and able to sell electric energy to TVA. A case concerning the application of PURPA to a State-regulated utility, *Smith Cogeneration Management, Inc. v. Corporation Commission*, 863 P.2d 1227 (Okla.1993), is instructive. In *Smith Cogeneration Management*, the cogenerator sought an order from the Oklahoma Corporation Commission directing a utility, Public Service Company of Okla-

---

6. While Mr. Justus of the plaintiff testified that TVA knew of the operational characteristics of the Clinch River facility from Mid–South's bankrupt predecessor's operation of it, this ignores the substantial work which the plaintiff performed on the facility pursuant to the plaintiff's

business plan, which included converting the facility from one using coal to a wood-waste-fired facility. There is no evidence that TVA inspected the facility for the purpose of considering a fixed-price contract with Mid–South.

homa (PSO), to enter into negotiation of an agreement for the purchase of energy, and determining the applicable avoided costs. Part of the cogenerator's argument was "that pursuant to an August, 1988, proposal to deliver power to PSO a unilateral, legally enforceable obligation arose requiring the Corporation Commission to set avoided costs for the life of the proposed agreement." *Id.* at 1232 (footnote omitted).

The Supreme Court of Oklahoma, in reviewing the corporation commission's orders, noted that in making this argument, the cogenerator had opted under the applicable FERC regulations to seek an order setting rates for avoided costs calculated at the time of incurring an obligation to sell energy, as opposed to being paid the rates in effect at the times of delivery of energy. "However," the court stated, "in order for a qualifying facility to be entitled to have avoided costs set for the life of a project, based on the date of the QF's action, the cogenerator must do something more than enter into negotiations." *Id.* at 1233–34 (footnote omitted).

> Here, Smith alleged that the cogeneration plant could make power cheaper than PSO and requested, pursuant to PURPA, that PSO buy Smith's power. Smith, rejecting PSO's avoided cost calculations and alleging that PSO would not negotiate a fair avoided cost rate, asked the Corporation Commission to estimate PSO's avoided costs and set them for the duration of the proposed sales agreement. However, Smith did not present a contract which obligated it to deliver power to PSO, nor did it attempt to obtain a contract for construction, operation and maintenance of the proposed project or a contract for the purchase of natural gas. Instead, Smith attempted to have estimated avoided costs established for a 15–year contract prior to establishing a legally enforceable obligation. The Corporation Commission found that Smith was entitled to avoided energy payments, but that because PSO would not need additional capacity until 1999, it would determine avoided capacity costs at a later date. Under these facts, we find nothing in PURPA which entitled Smith to have avoided costs fixed for the

life of the proposed power sales agreement.

*Id.* at 1234–35 (footnotes omitted). *See also* the authorities summarized in *Smith Cogeneration Management, supra,* 863 P.2d at 1234 n. 22.

Similarly, in this case, the plaintiff, by asserting a claim for relief under PURPA, in effect asks the court to compel TVA to enter into a contract with Mid–South for the purchase of energy in spite of the fact that Mid–South itself is not bound to deliver energy to TVA, and remains incapable of doing so. The evidence is clear that up to the time of this litigation, the Clinch River facility remained unfinished, not ready to generate electric energy for delivery to the TVA system through the Harriman Utility Board. The evidence is also clear that if the Clinch River facility becomes operable, then the defendant will be prepared to purchase electric energy from the plaintiff in accordance with the defendant's Dispersed Power Production Guidelines. This is all the relief to which the plaintiff is entitled under PURPA.

The defendant points out that the plaintiff did not become a qualifying facility by filing its self-certification application with FERC until December 30, 1992. The applicable regulations, in 18 C.F.R. § 292.207(a)(ii), state,

> The owner or operator of a facility or its representative self-certifying under this section must file with the Commission, and concurrently serve on each electric utility with which it expects to interconnect, transmit or sell electric energy to or purchase supplementary, standby, back-up and maintenance power, ... a notice of self-certification which contains a completed Form 556.

Some authority indicates that a cogenerator's or small power producer's lack of certification renders it not a qualifying facility, and therefore not entitled to any rights under PURPA. *See, e.g., A.W. Brown Company, Inc. v. Idaho Power Company,* 121 Idaho 812, 817, 828 P.2d 841, 846 (1992) (cogenerator not entitled to sell energy at an earlier, higher CSPP rate set by the Idaho Public Utilities Commission in part because it did not file notice of its status as a qualifying

facility until after the change in rates and after it commenced litigation). Even if the fact of the plaintiff's late filing with FERC in this case is not determinative, it is another item of evidence which establishes that during the relevant time period, Mid–South was not ready, willing, and able to sell energy to TVA, and therefore is not entitled to any relief under PURPA in this civil action.

■ The plaintiff is left, therefore, with its contract and misrepresentation theories of recovery. Whether Mid–South is entitled to relief in this civil action under a theory of contract or quasi-contract is a matter of federal, not State, law. *Hoke Company, Inc. v. Tennessee Valley Authority*, 661 F.Supp. 740, 744 n. 3 (W.D.Ky.1987), *affirmed*, 854 F.2d 820 (6th Cir.1988) (citations omitted).

■ The court concludes that there is no enforceable contract between these parties in this case. TVA's internal code is clear on the point that an agreement between TVA and another entity must be evidenced by a written contract. More specifically, the Dispersed Power Price Schedule CSPP in effect as of April 1, 1984, published in the Federal Register on April 30, 1984, states simply, "Contracts are required for purchases hereunder." In the Dispersed Power Production Guidelines, it is provided, "All qualified producers that desire to sell power to the distributors of TVA power or TVA will be required to execute contractual agreements."

■ "To recover on an express agreement with a government agency, the agreement must be in writing and signed by an authorized person." *Daly Construction, Inc. v. Garrett*, 5 F.3d 520, 521 (Fed.Cir.1993) (citation omitted). Mid–South failed to prove the existence of such an agreement. To the extent that the plaintiff argues that a contract should be implied on the basis of representations made by TVA and reliance by Mid–South on such representations, or that TVA should be estopped to deny the existence of the contract which Mid–South says exists, the plaintiff's proof likewise fails to justify relief under any such theory. "To prove that an implied-in-fact contract exists, [a claimant against the government bears the burden] to show mutuality of intent to contract, offer and acceptance, and that the offi-

cer whose conduct is relied upon had actual authority to bind the government in contract." *H.F. Allen Orchards v. United States*, 749 F.2d 1571, 1575 (Fed.Cir.1984), *cert. denied*, 474 U.S. 818, 106 S.Ct. 64, 88 L.Ed.2d 52 (1985) (citations omitted); *see also H. Landau & Company v. United States*, 886 F.2d 322, 324 (Fed.Cir.1989).

The plaintiff failed to prove by a preponderance of the evidence, the court concludes, mutuality of intent and offer and acceptance. The fact that late in the parties' negotiations, the plaintiff was proposing changes to TVA's draft of a written contract, even though the plaintiff characterized this as "accepting" the draft subject to the proposed changes, shows the absence of offer and acceptance. It is apparent from the evidence and from the plaintiff's theories in this litigation that to the plaintiff, the price term was the single most important aspect of any agreement between these parties, yet the evidence, even when viewed in the light most favorable to Mid–South, shows at best confusion between the parties concerning whether the proposed contract was a fixed-price or a Part C contract, and even shows confusion on the part of the plaintiff concerning the difference between a fixed-price and a Part C contract. After the elimination of Part C from the defendant's price schedule, the evidence shows, the parties discussed forming a contract under Part B with adders, but no agreement was ever reached concerning the amounts of the adders, a key term in such a contract. Only an unreasonable, strained interpretation of these facts could lead to a finding of mutuality of intent between these parties.

■ The plaintiff relies to a great extent on its perception that Mr. Powell, acting on behalf of TVA, made a firm offer, which the plaintiff accepted, to deal on the basis of fixed prices, with the details of the contract to be supplied later. As the court has indicated above, the court finds that Mr. Powell made no representation that anything less than a signed writing was needed to form a contract between these parties. The court also finds that neither Mr. Powell nor anyone else associated with TVA made any mislead-

ing representation to Mid–South concerning the scope of Mr. Powell's authority to act on behalf of the defendant. Furthermore, "[a]s a matter of law, TVA, a wholly government owned corporation, acting as an agency of the federal government, cannot be contractually bound by representations of an employee made without actual authority." *Hoke Company, Inc. v. Tennessee Valley Authority, supra,* 661 F.Supp. at 745 (citations omitted). Federal law distinguishes between the implied authority and the apparent authority of a government agent; "apparent authority will not suffice to hold the government bound by the acts of its agents." *H. Landau & Company v. United States, supra,* 886 F.2d at 324 (citation omitted).

Here, the evidence being clear that Mr. Powell had no actual authority to bind TVA to a contract for the purchase of energy, the court cannot imply from what actual authority he did have authority so to bind his employer. Even if TVA somehow, through some means other than any representation made by Mr. Powell himself, created the appearance that Mr. Powell could conclude such an agreement without review by his superiors and approval by TVA's board of directors, the law is clear that Mid–South relied on any such appearance authority at its peril.

■ The plaintiff's final theory of recovery in this civil action is that it is entitled to relief on the ground of one or more misrepresentations made by TVA and on which the plaintiff relied. As the court has already found, Mr. Powell did not misrepresent to Mid–South that these parties had a fixed-price contract, and Mid–South clearly did not rely on any such misrepresentation in going forward with its business plan to purchase and refurbish the Clinch River facility. The evidence concerning Mid–South's appearance before the bankruptcy court which considered the plaintiff's offer to purchase this facility shows that in presenting its position to that court, the plaintiff was relying not on any contract, but on its rights under

PURPA. As the court has explained above, these statutory rights place on the cogenerator or small power producer the risk that, in the absence of a fixed-price contract, statutory rates based on avoided costs will not provide a desired degree of profitability.

■ Success under a theory of promissory fraud requires a showing that the defendant made a promise of future conduct with the then-present intention not to perform the promise. *Sanders v. First National Bank & Trust Company in Great Bend,* 936 F.2d 273, 278 (6th Cir.1991) (citation omitted) (applying Tennessee law [7]). The court finds that even if Mr. Powell, acting on behalf of TVA, made any such promises to Mid–South, he did not make them with the intention not to keep them. The court also concludes that in its Table 34 and in its Dispersed Power Production Guidelines and price schedules, TVA made no misrepresentation concerning the fact that rates based on avoided costs were subject to change, and made no promise that they would not change in the plaintiff's case.

For the reasons stated, the court concludes that the plaintiff is not entitled to any relief in this civil action, and that the defendant is entitled to a judgment of dismissal of this civil action. The court will issue an order directing the clerk to enter judgment in accordance with the court's findings and conclusions.

## ORDER

For the reasons stated in the court's findings of fact and conclusions of law filed with this order, it is **ORDERED** that the plaintiff shall not recover any relief in this civil action, and that the defendant shall be awarded a judgment of dismissal of this civil action. The clerk is directed, under Fed.R.Civ.P. 58, to enter judgment in this civil action in accordance with this determination.

The court having adjudicated all of the issues presented in this civil action, it is

7. In arguing concerning this aspect of the plaintiff's claims in this civil action, the parties appear to have assumed that if federal law governs a claim for misrepresentation or promissory fraud against TVA under the facts and circumstances of this case, the content of such law is similar to that of Tennessee law on the same subject. This is an assumption which the court shares.

**ORDERED** that the defendant's motion for summary judgment [doc. 12] is **DENIED.**