917 P.2d 781

**ROSEBUD ENTERPRISES, INCORPORATED, Complainant–Appellant,**

v.

**IDAHO PUBLIC UTILITIES COMMISSION, Idaho Power Company, and Pacificorp, Defendants–Respondents.**

No. 21754.

Supreme Court of Idaho, Boise, December 1995 Term.

May 30, 1996.

Orndorff & Trout, Boise, for appellant. Owen H. Orndorff argued.

Alan G. Lance, Attorney General, Scott D. Woodbury, Deputy Attorney General (argued), Boise, for Idaho Public Utilities Commission. Scott D. Woodbury argued.

Evans, Keane, Boise, for Idaho Power Co. Barton L. Kline argued.

Stoel, Rives, Boley, Jones and Grey, Portland, OR, for Pacificorp.

SCHROEDER, Justice.

This is an appeal by Rosebud Enterprises, Inc. (Rosebud) from Idaho Public Utilities Commission (IPUC) Orders 25454, 25706, and 25787. The orders of the IPUC establish an avoided cost rate to be paid by Idaho Power Company (Idaho Power) for the purchase of electric capacity and energy from Rosebud.

# I.

## BACKGROUND AND PRIOR PROCEEDINGS

### A. Parties

Rosebud is the developer of a small power production "qualifying facility" (QF) under the Public Utility Regulatory Policies Act of 1978 (PURPA), Pub.L. No. 95–617, 92 Stat. 3117 (codified as amended at 16 U.S.C.A. §§ 2601—2645 (West 1995)). Rosebud proposes to develop a 40 megawatt (MW) electric generating facility near Mountain Home, Idaho, that will burn waste petroleum coke.[1] Rosebud proposes to sell the electrical output of the facility to Idaho Power.

Idaho Power is a public utility subject to state regulation and is a state regulated utility within the meaning of PURPA. PacifiCorp is a regulated public utility which intervened in the proceedings before the IPUC. Rosebud proposes to develop a similar 40 MW qualifying facility in Montpelier, Idaho, and sell the generation to PacifiCorp.[2]

The IPUC is the state agency with regulatory authority over Idaho Power under both The Public Utilities Law, Chapters 1–7, Title 61, Idaho Code, and PURPA.

### B. The Regulatory Scheme

█ Congress passed PURPA as part of the National Energy Act. Pub.L. No. 95–617, 92 Stat. 3117 (1978) (codified as amended at 16 U.S.C.A. §§ 2601—2645 (West 1995)). The purpose of PURPA is to encourage the promotion and development of renewable energy technologies as alternatives to fossil fuels and the construction of new generating facilities by electric utilities. *American Paper Inst. v. American Elec. Power Serv. Corp.*, 461 U.S. 402, 405, 103 S.Ct. 1921, 1924, 76 L.Ed.2d 22 (1983). Section 210 of PURPA requires that electric utilities offer to purchase power produced by cogenerators or small power producers that obtain qualifying status under Federal Energy Regulatory Commission regulations. 16

U.S.C.A. § 824a–3(b) (West 1985). The rate to be paid for such power is not to exceed the "incremental cost" to the utility of alternative electric energy. 16 U.S.C.A. § 824a–3(b).

The Federal Energy Regulatory Commission (FERC) promulgated rules implementing Sections 201 and 210 of PURPA. 16 U.S.C.A. §§ 824, 824a–3. The rate a qualifying facility is to receive for the sale of its power is generally referred to as the "avoided cost" rate, which is the incremental cost to an electric utility of electric energy or capacity or both, which such utility would generate itself or purchase from another source but for the purchase from the qualifying facility. 18 C.F.R. § 292.101(b)(6) (1995). Section 210(b) of PURPA and related FERC regulations provide that the rates for QF purchases (1) shall be just and reasonable to the electric consumers of the electric utility and in the public interest and (2) shall not discriminate against qualifying cogenerators or small power producers. 18 C.F.R. § 292.304(a)(1) (1995). Nothing in the regulations requires any utility to pay more than the avoided costs for purchases. 18 C.F.R. § 292.304(a)(2).

The implementation of the FERC regulations was left to the regulatory authorities of the states. The grant of authority to the states in implementing the regulation of sales and purchases between QFs and electric utilities and determining avoided costs is broad. FERC regulations provide no precise formula for calculating a utility's avoided costs.

In fulfilling its duties and obligations under sections 201 and 210 of PURPA and the implementing regulations promulgated by FERC, the IPUC issued Order No. 15746 in 1980 which sets forth the general framework under which Idaho electric utilities are to purchase power from qualifying facilities. Under FERC rules and regulations, published rates are required only for purchases from qualifying facilities with a design capacity of 100 kilowatts (KW) or less. 18 C.F.R. § 292.304(c) (1995). PURPA, however, does

---

1. Coke: Solid carbonaceous residue obtained from bituminous coal after removal of volatile material by destructive distillation, used as fuel and in making steel. *Webster's II New Riverside University Dictionary*, 1988.

2. For further background *see Rosebud Enter., Inc. v. Idaho Pub. Util. Comm'n and PacifiCorp*, 128 Idaho 609, 917 P.2d 766 (1996).

not prohibit the publishing of rates for larger projects.

The IPUC set the design capacity limit for published rates at 10 megawatts (MW) (10,000 KW). IPUC Order No. 15746. The IPUC requires that rates and contracts for facilities larger than 10 MW be individually negotiated. Contracts with facilities in excess of 10 MW in design require individual approval by the IPUC. According to the IPUC the published or filed avoided cost rates form the "starting point for negotiations" for such facilities, but individualized consideration is to be given to issues such as "losses, reliability, ability to schedule and so forth." *Id.*

▋ Published rates for small QFs at the times relevant in this case were based on the costs of a Surrogate Avoided Resource (SAR), a hypothetical coal-fired plant located in eastern Wyoming. IPUC Order No. 22636. A surrogate resource is a means of estimating the value of energy and capacity.[3] The proxy unit need not actually be within a utility's resource plan. This methodology is commonly referred to as the "SAR methodology." The published rates for Idaho Power on December 14, 1992, for QFs less than 10 MW were the rates established in IPUC Order No. 24383. The IPUC's initial standard, requiring negotiation of rates for QFs larger than 10 MW, although modified by subsequent orders, is the basic standard at issue here.

### C. The Complaint and Negotiations

After attempted negotiations with Rosebud, Idaho Power rejected a Rosebud proposal and stated in a letter dated December 10, 1992, that "[b]ased on the most recent evaluation of firm future loads and the timing of the acquisition of known firm, non-deferrable resources, Idaho Power has determined that it will not need to acquire any additional resources prior to the year 2000." In response, Rosebud filed a Complaint with the IPUC on December 14, 1992 (Case No. IPC–E–92–31), seeking an IPUC Order directing Idaho Power to purchase capacity and firm energy and provide Rosebud with avoided cost rates for a proposed 40 MW electric generating facility to be located in Mountain Home. Rosebud represented that it wanted to sell its generation to Idaho Power and was "ready, able and willing to sign a contract" with Idaho Power. Rosebud's projected net annual energy production was 336,384,000 KW hours. Rosebud sought an avoided cost rate to ascertain project viability for the Mountain Home site.

In defense, Idaho Power asserted that Rosebud was insisting on rates and a contract prior to any substantive negotiations reflecting the proposed project's effect on Idaho Power's load-resource balance. Idaho Power alleged that it had no need for resources prior to the year 2000 and asserted that it would be imprudent to contractually commit at such an early date to a 1998 40 MW 35-year resource. Idaho Power requested that Rosebud's Complaint either be dismissed or deferred until Idaho Power filed its Resource Management Report (RMR) with the IPUC in March of 1993. Alternatively, Idaho Power requested that a special hearing be convened to determine Idaho Power's need for the output of the proposed Mountain Home project and the rates for any purchases of the power generated by the project.

The IPUC was unwilling to suspend or defer the obligation of Idaho Power Company to negotiate with Rosebud and recognized that it had not provided specific guidelines for the parties to follow, since the proposed project is greater than 10 MW. Subsequently the IPUC directed the parties to submit a detailed written identification of policy and factual issues which they perceived to be

---

**3.** The total costs of a generating facility are segregated into two main categories—"capacity" and "energy." The capital costs of a generating facility are generally allocated to capacity. Capital costs include costs of constructing and installing generating equipment and facilities and the financial carrying costs associated with the utility's investment in the facility. Once incurred, these investment costs are assumed to be "fixed" and will not vary with changes in the actual amount of generation.

Costs allocated to "energy" are the costs generally associated with the variable costs of operating, maintaining and fueling the facility. Increased generation means increased fuel consumption and increased operation and maintenance expense. As a result, energy costs do vary depending on actual generation.

presented for determination. Upon receipt of the respective statements, the IPUC issued a Notice stating:

Attempts by the parties to tailor facts and prior Commission order language to the specifics of this particular project may be a meaningless exercise, akin to putting a square peg through a round hole. The Commission's more general pronouncements regarding QFs greater than 10 MW, however, are still valid and applicable. (citations omitted). The lack of a history with projects greater than 10 megawatts is reason (in part) that some of the issues the parties are struggling with have not previously come to the fore.

Rosebud proposed to provide Idaho Power with capacity and energy based on Idaho Power's Firm Energy Sales Agreement with Meridian Generating Company (an independent third party), including rates, terms and conditions, "excepting only the site, fuel, initial date of operation changed to January 1, 1998, and sizing the project." Idaho Power contended that the "rates, terms, and conditions (of the contract) should be negotiated based on need, dispatchability and other least-cost planning criteria."

## D. The Public Hearing, Post–Hearing Briefs and Commission Order 25454

The public hearing was conducted between December 15, 1993, and January 11, 1994. Rosebud contended that Idaho Power is obligated to contract with Rosebud at rates similar to those contained in the Idaho Power–Meridian Generating Company Agreement. The Meridian project 35–year non-levelized rates were negotiated as a part of a comprehensive settlement of various lawsuits and other disputes arising out of an earlier Power Sales Agreement between Idaho Power and Afton Energy, Inc. The proposed Meridian project was a 54 MW gas-fired cogeneration facility. The IPUC characterized these rates as "unique" and without precedential value. Idaho Power presented three sets of avoided cost rates for the Rosebud facility which were developed utilizing Idaho Power's Integrated Resource Plan (IRP), rather than the established avoided cost methodology and adjusted from the posted rates for small QFs.

Idaho Power contended that use of the IRP for acquisition and pricing of large resources is preferable to the avoided cost methodology used for small QFs.

The IPUC defined the methodology to be used in determining the rates for Rosebud in Order No. 25454, determining that "Idaho Power did not negotiate with Rosebud in accordance with established avoided cost methodology and rules for negotiation with QFs greater than 10 MW." The IPUC directed "Idaho Power to follow the established methodology and to calculate and provide Rosebud with avoided cost rates using as a 'starting point' the firm rates in existence on December 14, 1992, the complaint filing date."

The IPUC focused on its prior decisions and indicated that for facilities with a design capacity in excess of 10,000 KW (10 MW) published rates would "form the starting point for negotiations, but individualized consideration [is to] be given to issues such as losses, reliability, ability to schedule, etc." IPUC Order No. 17546. In Order No. 20859 the IPUC stated, "We agree that filed rates should be the basis for negotiation." The IPUC rejected Idaho Power's proposed Integrated Resource Plan methodology and ordered Idaho Power to utilize SAR methodology and use the firm rates previously established in Order No. 24383 as the starting point.

## E. Post-Order No. 25454

Order No. 25454 provided, "If a rate has not been successfully negotiated within 60 days, the Company is directed to present Rosebud with its proposed avoided cost rate with detailed justification.... The proposed rates must be rates at which the Company is willing to purchase Rosebud's capacity and energy." The 60–day period ended on June 20, 1994. On June 27, 1994, Idaho Power filed proposed unlevelized capacity and energy rates for the purchase of Rosebud generation. Idaho Power also proposed adjustments for project reliability, scheduling, cost of capital and restrictions on planning and investment flexibility.

Rosebud responded by filing proposed rates. Rosebud contended that Idaho Power's proposal did not follow existing method-

ology, and that Rosebud was entitled to the default rates in Order No. 24383, the established rates for small QFs. Rosebud also challenged all of Idaho Power's adjustment factors.

 The IPUC issued its Final Order No. 25706 accepting Idaho Power's June 27, 1994, rate proposal, modifying the adjustment factors used, and finding that Idaho Power's filing complied with Order No. 25454 by using as its starting point the firm rates established in Order No. 24383. "We find the proposed variances from the established underlying methodology and assumptions to be reasonable for QFs greater than 10 MW, i.e. requirement for dispatchability,[4] unlevelized rates,[5] and separate capacity and energy payments." IPUC Order No. 25706.

The IPUC made additional findings with regard to the adjustments made by Idaho Power, determining the proposed scheduling constraints for Rosebud to be reasonable, and accepting Idaho Power's proposal to purchase only 75 percent of Rosebud's estimated annual generation. Idaho Power would purchase 100 percent of Rosebud's capacity and an annual minimum of 282,510,000 kilowatt hours of energy. The IPUC noted:

> Rosebud is not required to limit its annual generation to the amount of energy IPCo has elected to schedule. It is free to sell any available excess capacity and energy off system in reliance on IPCo's proposed scheduling. Idaho Power has committed to wheel same assuming the availability of adequate transmission capability.

The IPUC determined that Idaho Power's proposed reliability adjustment would be more appropriately addressed by negotiated contract terms than a specific numeric adjustment to the rate. The IPUC rejected Idaho Power's proposed adjustments relating to cost of capital and loss of flexibility as being unreasonable. Idaho Power was directed to recalculate and offer avoided cost rates to Rosebud in accordance with the method and adjustments approved.

Rosebud petitioned for reconsideration of Orders 25454 and 25706, contending that the IPUC was wrong in not requiring Idaho Power to purchase all of Rosebud's capacity and energy. Idaho Power filed a Second Compliance Filing and sent a second set of avoided cost compliance rates to Rosebud. Idaho Power also petitioned for reconsideration of IPUC Orders No. 25706 and 25454, claiming that the orders required it to purchase Rosebud's output at rates that exceeded the Company's actual avoided costs. In addition, PacifiCorp filed a Cross–Petition for Reconsideration of Orders 25454 and 25706.

The IPUC denied the petitions for reconsideration, finding that its prior Order No. 25706 approved a method for calculating rates for Rosebud "that is fair, just and reasonable and consistent with the requirements of PURPA, the implementing regulations of FERC, and the related avoided cost methodology approved by this Commission." IPUC Order No. 25787. As a point of clarification, the IPUC noted that Order No. 25706 requires Idaho Power to "purchase 100% of the capacity and 75% of the annual energy of Rosebud in accordance with the Company's proposed delivery schedule. (citations omitted). The value of such a contract on an annual basis will be equivalent to purchasing annual generation under an all energy rate and a 75% annual capacity factor." *Id.*

The IPUC also responded to Idaho Power's concerns in stating that "[s]ubsequent and intervening events and changes in load/resource balance do not affect the rates that Rosebud is otherwise entitled to receive pursuant to 18 C.F.R. § 292.304, and pursuant to a contract that we find may have been earlier negotiated but for the actions of Ida-

---

4. Dispatchability refers to a utility's ability to control a resource's output, including the ability to turn the plant "on" and "off" at the dispatcher's discretion based on consumer power demands and the seasonal availability of more cost effective power such as hydroelectric.

5. The levelization of rates is a calculation by which a utility's stream of avoided cost payments over a particular period of time is converted to a nominally different, but equivalent in present worth terms, stream of payments. The inverse method of rate calculation generates "unlevelized rates," which is the payment for energy based on the amount purchased, which fluctuates over time.

ho Power Company and the procedure adopted in this case." *Id.*

Rosebud petitioned the IPUC for further clarification of its orders regarding the pricing of excess energy above the minimum scheduled amounts (282,510,000 KW hours), contending that it had a right to receive prevailing market prices for such generation and not the Colstrip variable energy rate ($.01089/kwh) set forth in Idaho Power's Second Compliance Filing.[6] Rosebud asserted that "[i]f IPCo wants all the right to all the energy, IPCo should pay the full avoided cost instead of only 75% of full avoided costs." Idaho Power responded that because it was purchasing all of Rosebud's capacity, all energy it chose to schedule above the minimum 282,510,000 KW hours could be purchased at the variable rate, should Rosebud elect to generate. Idaho Power felt that no clarification was necessary.

In Order No. 25829 the IPUC stated the following:

> In an effort to prevent further confusion of the parties, we find it reasonable to offer the following by way of clarification. The intent of Commission Order Nos. 25706, and 25787 is to require Idaho Power to purchase a minimum of 282,510,000 kwh of annual generation under the schedule proposed by the Company. Any generation scheduled by IPCo in excess of the proposed minimum schedule can be purchased at the Colstrip variable energy price (citation omitted). Rosebud, however, is under no obligation to generate beyond the minimum schedule proposed by IPCo. Any Rosebud generation in excess of the proposed minimum schedule and not scheduled by IPCo may be sold off system with wheeling provided by IPCo. IPCo's interpretation of those orders is consistent with our intent and decision.

## II.

### STANDARD OF REVIEW

The Idaho Constitution provides that the Supreme Court shall have jurisdiction to review on appeal any order of the Commission. Idaho Const. art. 5, § 9. The Idaho Code has limited the scope of this review:

> The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the appellant under the constitution of the United States or of the state of Idaho.

I.C. § 61–629 (1994). The standard which this Court is to utilize in a review of an IPUC order is a determination of whether the IPUC "regularly pursued its authority."

In *A.W. Brown, Inc. v. Idaho Power Co.,* 121 Idaho 812, 828 P.2d 841 (1992), this Court ruled that review of IPUC decisions as to questions of law is limited to a determination of whether the IPUC has regularly pursued its authority and whether the constitutional rights of the appellant have been violated. *Id.* at 815, 828 P.2d 841. Regarding questions of fact, the Court ruled that "where the Commission's findings are supported by substantial, competent evidence, this Court must affirm those findings" and "is obligated to affirm its decision." *Id.* at 815–16, 828 P.2d 841 (citing from *Empire Lumber Co. v. Washington Water Power,* 114 Idaho 191, 755 P.2d 1229 (1987), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988)). In *Utah–Idaho Sugar Co. v. Intermountain Gas Co.,* 100 Idaho 368, 597 P.2d 1058 (1979), this Court stated that, "In reviewing findings of fact we will sustain a Commission's determination unless it appears that the clear weight of the evidence is against its conclusion or that the evidence is strong and persuasive that the Commission abused its discretion." 100 Idaho at 376, 597 P.2d at 1066.

■ The IPUC's findings of fact are entitled to a presumption of correctness, and the burden is on Rosebud to show that those findings are not supported by the evidence. With regard to questions of law, the review on appeal to this Court is limited to whether the IPUC "regularly pursued its authority." I.C. § 61–629.

---

**6.** The Colstrip variable energy rate refers to the actual variable operating costs of a power generating facility in Colstrip, Montana.

## III.

### THE IPUC'S ALLOWANCE OF ADJUST-MENTS TO THE AVOIDED COST RATES APPROVED IN IPUC OR-DER NO. 24383 ARE CONSISTENT WITH PURPA, FERC REGULA-TIONS AND PRIOR IPUC ORDERS

■ Section 210 of PURPA requires electric utilities to purchase power from small power producers that obtain qualifying status under the FERC regulations. 16 U.S.C.A. § 824a-3(a) to (d). Under the FERC regulations the rate a QF is to receive for the sale of its power is the "avoided cost" rate. 18 C.F.R. § 292.304(a)(2). "Avoided costs" are "the incremental costs to an electric utility of electric energy or capacity or both which, but for the purchase from the qualifying facility or qualifying facilities, such utility would generate itself or purchase from another source." 18 C.F.R. § 292.101(b)(6). Section 210 of PURPA mandates that the rate is not to exceed the incremental cost to the electric utility of alternative electric energy, shall be just and reasonable to the electric consumers of the electric utility and in the public interest, and shall not discriminate against qualifying cogenerators or small power producers. 16 U.S.C.A. § 824a-3(b).

The published rates in effect on the date Rosebud's Complaint was filed applied to QFs of 10 MW or less. The QF proposed by Rosebud is substantially larger than 10 MW. The significance of the posted rates of Order No. 24383 is that they form the "starting point for negotiation." IPUC Order No. 25454. The approved rates for Rosebud used the published rates as a starting point and allowed for adjustments.

FERC regulations state that the following factors shall be taken into account, to the extent practicable, when determining avoided costs: dispatchability (18 C.F.R. § 292.304(e)(2)(i)), reliability of the QF (18 C.F.R. § 292.304(e)(2)(ii)), the terms of the contract (18 C.F.R. § 292.304(e)(2)(iii)), scheduling of outages (18 C.F.R. § 292.304(e)(2)(iv)), the usefulness of the energy and capacity supplied during system emergencies (18 C.F.R. § 292.304(e)(2)(v)), and the value of the energy and capacity to the utility's system (18 C.F.R. § 292.304(e)(2)(vi)). 18 C.F.R. § 292.304(b)(2).

The IPUC determined that project reliability could best be addressed in a security provision of a contract between Idaho Power and Rosebud, rather than in a specific adjustment to the rates Idaho Power proposed to pay Rosebud. The IPUC found the proposed scheduling constraints for Rosebud reasonable and accepted Idaho Power's proposal that it purchase only 75 percent of Rosebud's annual generation. The IPUC determined the scheduling flexibility and capacity factor constraints to be reasonable methods of providing project dispatchability. The IPUC rejected an adjustment proposed by Idaho Power to reflect the impact the purchase from Rosebud would have on Idaho Power's cost of capital. The IPUC based its rejection on the fact that there remains an element of uncertainty regarding the relationship of nondiscretionary QF purchases to cost of capital. The IPUC also rejected an adjustment for loss of flexibility to control the timing of the SAR asserting that the existing methodology included a trigger mechanism that took into account the reduced value of resources acquired prior to the estimated date of need.

The factors considered by the IPUC are consistent with the FERC regulations in determining avoided costs. The record establishes that the IPUC regularly pursued its authority and that its findings are supported by substantial and competent evidence.

## IV.

### THIS COURT WILL NOT DETERMINE THE RATES ROSEBUD IS ENTI-TLED TO RECEIVE IF IT ALTERS ITS PROJECT

■ Rosebud argues that as a result of Idaho Power's unrelenting opposition to Rosebud's facility it should be allowed to adjust its fuel project location and size to reflect delays caused by Idaho Power's refusal to comply with PURPA. This relief was not requested of the IPUC and is, therefore, not a proper subject for appeal. I.C. §§ 61–626 to 627. Once again, "It is a well settled rule that in an appeal from the commission matters may not be raised for the first time on

appeal and that where the objections were not raised in the petition for rehearing, they will not be considered by this court." *Key Transp., Inc. v. Trans Magic Airlines Corp.,* 96 Idaho 110, 112–13, 524 P.2d 1338, 1340–41 (1974). Idaho Code section 61–629 requires that "no new or additional evidence" be introduced in the Supreme Court. Rosebud has requested that it be permitted to switch its fuel source to gas, which is a non-qualifying fuel source. 18 C.F.R. § 292.304(a)(2). Such a switch would make Rosebud ineligible to receive the benefits of PURPA. Rosebud's request to have the rates approved by this Court apply to a project with features different from that proposed to the IPUC is beyond the scope of this Court's review.

## V.

### CONCLUSION

The decision of the IPUC is affirmed. Rosebud's request that this Court set the rates for an altered facility is denied. The respondents are awarded costs. No attorney fees are allowed.

McDEVITT, C.J., JOHNSON and SILAK, JJ., and REINHARDT, J. Pro Tem., concur.