120 P.3d 736

In the Matter of the Joint Petition of Robert Ryder, dba Radiopaging Service, Joseph McNeal, dba Pagedate and Interpage of Idaho, for a Declaratory Order and Recovery of Overcharges from U.S. West Communications, Inc.

Robert RYDER dba Radio Paging Service, Joseph B. McNeal dba Pagedate and Interpage of Idaho, Petitioners–Appellants–Cross Respondents,

and

Tel–Car, Inc., Petitioner,

v.

IDAHO PUBLIC UTILITIES COMMISSION, Respondent on Appeal–Cross Respondent,

and

Qwest Corporation, Respondent–Respondent on Appeal–Cross Appellant.

No. 29175.

Supreme Court of Idaho, Boise, March 2005 Term

Sept. 6, 2005.

Brad M. Purdy, Boise for appellants.

Hon. Lawrence G. Wasden, Attorney General, Boise, for respondent Idaho Public Utilities Commission. Donald L. Howell argued.

Batt & Fisher, Boise, for respondent Qwest Corporation. William J. Batt argued.

SCHROEDER, Chief Justice.

Robert Ryder, d/b/a Radio Paging Service, Joseph B. McNeal, d/b/a PageData and InterPage of Idaho, and Tel–Car, Inc. (Pagers), appeal from Order(s) No. 29064 and 29140 of the Idaho Public Utilities Commission (IPUC). Qwest Corporation (Qwest), cross appeals from Order(s) No. 29555 and 29603 of the IPUC.

## I.

### FACTS AND PROCEDURAL BACKGROUND

The Pagers are Commercial Radio Service Providers (CMRS) providing one-way paging services to their customers in Idaho through what is commonly called a Type I Interconnection with the US West (Qwest [1]) network. PageData negotiated an Interconnection Agreement with Qwest which was approved by the Commission on September 10, 1999. Radio Paging also negotiated an Interconnection Agreement, which was approved by the Commission on May 13, 1999. InterPage and Tel–Car have no Interconnection Agreement with Qwest.

---

1. On June 30, 2000, US WEST, Inc., the parent and sole shareholder of US WEST Communications, Inc., merged with Qwest Communications International, Inc., and on July 6, 2000, US WEST was renamed Qwest Corporation.

On September 24, 1999, the Pagers filed a petition for Declaratory Order stating two counts for relief. According to their petition, each Pager has purchased certain facilities from Qwest for the purpose of interconnecting with Qwest and transporting traffic to the Pagers' respective customers. The Pagers contend that Qwest is prohibited from charging for the use of these facilities, since September 1996, the date the Federal Communications Commission (FCC) rules applicable to interconnection became effective. More specifically, the Pagers allege that the Telecommunications Act of 1996 (47 U.S.C. §§ 153 et seq.) and the FCC rules (47 C.F.R. § 51.701) prohibit Qwest from charging them or other paging companies for use of Qwest's transmission facilities on a dedicated basis to deliver local traffic to them that originates on Qwest's network. The Pagers also allege that Qwest has offered or provided other paging companies more favorable terms, conditions or rates than have been offered them. The Pagers seek reimbursement for all charges incurred under the Price List [2] during the period of time not covered by an Interconnection Agreement. The Pagers contend that these services and dedicated facilities used to deliver traffic to them must be provided free of charge. On July 5, 2000, the Commission dismissed both Counts (Order No. 28427).

The Pagers filed a Motion for Reconsideration alleging that the Supremacy Clause of the United States Constitution and the FCC rules obligate the states, in this case the Commission, to enforce federal law. Qwest answered the Petition for Reconsideration which supported the grant of reconsideration to consider the effect of a recent decision, *TSR Wireless, LLC v. US West Communications, Inc.,* 2000 WL 796763, 21 Communications Reg. (P & F) 49 (F.C.C. 2000). The Commission granted the Motion for Reconsideration on August 9, 2000. Upon rehearing, the Commission held (Order No. 28601) that pursuant to I.C. § 62-616, the Commission has the authority to resolve customer complaints, subject to Title 62, about whether the price and conditions

of service are in conformance with filed tariffs or price lists. The Commission found that there is an agreement between the parties that the Pagers are entitled to a billing credit or reimbursement for the charges they have incurred sometime after late 1996. The Commission: (1) reinstated Count I and granted the Pagers relief; (2) found Tel–Car was entitled to a billing credit or reimbursement for the period between September 24, 1996, and September 24, 1999; (3) found InterPage was entitled to a billing credit or reimbursement for the period between September 24, 1996, and September 24, 1999; (4) found Radio Paging was entitled to a billing credit or reimbursement for the period between September 24, 1996, and May 13, 1999; (5) found PageData was entitled to a billing credit or reimbursement for the period between September 24, 1996, and September 10, 1999; and (6) ordered the parties to submit to each other detailed materials evidencing amount of the billing credit or reimbursement so that they may meet and attempt to agree upon the amount of credit or reimbursement.

On January 2, 2001, the Pagers filed a Petition to Amend several paragraphs of the Commission's Final Order on Reconsideration No. 28601. On February 5, 2001, the Commission issued Order No. 28626 partially granting and partially denying the Petition to Amend.

Due to the parties' inability to resolve the issue of the billing credit or reimbursement, the Commission ordered the appointment of a Hearing Examiner. The Hearing Examiner conducted an evidentiary hearing and received post-hearing briefs. He issued his proposed order on November 30, 2001, recommending that the Pagers were entitled to billing credits, although not in the amount they had claimed. The Hearing Examiner found that Qwest had offered better evidence regarding the billing and payment information from November 1996 to September 1999 and that some of the services and facilities used by the Pagers were used to provide other, non-paging communication services

---

**2.** Price List is a list of rates and charges for use of facilities for Title 62 services provided by Qwest.

(long-distance, cellular, two-way answering, data, Internet access, and private line services) to their customers. The Hearing Examiner determined that Qwest had made reasonable efforts to distinguish facilities used for delivering paging traffic by performing a billing element-by-element review. Consequently, the Hearing Examiner determined that credit was not due for: (1) non-paging services and facilities, (2) "transit traffic" from carriers other than Qwest, and (3) services and facilities provided by Qwest that effectively allowed customers to call the Pagers toll-free. The Hearing Examiner directed that Qwest make minor changes to its calculation of the billing credits owed to the Pagers.

The Pagers timely filed exceptions to the Proposed Order. Qwest submitted its recalculation of the billing credit owed to the Pagers. Qwest requested permission to file a reply to the Pagers' exceptions and followed that request by submitting various attachments to its "Request for Leave to Reply." The Pagers filed an objection to Qwest's request and filed another request to supplement their exceptions to the Proposed Order. Qwest did not file an answer to this latest request.

Following conclusion of the proceedings before the Hearing Examiner, the Commission reviewed the evidentiary record and the Hearing Examiner's recommended findings of fact. After conducting its de novo review, the Commission issued a lengthy Order affirming and expanding on the Hearing Examiner's proposed findings of fact. The Commission's Credit Order No. 29064 issued July 17, 2002, addressed the following issues.

1. *Refund Period:* In the Commission's Credit Order, it determined that the refund period for each carrier should begin November 1, 1996 (i.e., effective date of the FCC's *Local Competition Order*). The Pagers' complaint asked for refunds up until the time

they entered into interconnection agreements with Qwest. The Commission determined that the refund period for each Pager was: (1) PageData—November 1, 1996, to September 10, 1999; (2) Radio Paging—November 1, 1996, to May 13, 1999; and (3) Tel–Car—November 1, 1996, to September 24, 1999.

2. *The Two Late Pleadings:* The Commission declined to consider the Pagers' two late-filed pleadings because the record had already closed. The Commission observed that the "so-called secret" interconnection agreements [3] were not applicable to this case because: (1) the agreements and their terms were not pertinent to the substance of the complaint, and (2) the agreements were (with one exception) all executed after the refund periods.

3. *Non–Paging Services:* The Commission agreed with the Hearing Examiner that it was inappropriate to credit the Pagers for their non-paging services. The Pagers were only entitled to credits for their one-way paging services.

4. *Transit Traffic:* Although Qwest is prohibited from charging one-way paging carriers for the delivery of Qwest-originated traffic, the Commission recognized that the FCC allows Qwest to charge the Pagers for "transit traffic." In compliance with these controlling FCC orders [4], Qwest is permitted to charge the Pagers for transit traffic originated by third party carriers. The Commission found that 24% of the Pagers' traffic was properly classified as transit traffic.

5. *Wide Area Calling:* The Commission also found that Qwest may charge the Pagers for "wide area calling" arrangements. Wide area calling generally refers "to an arrangement that allows a paging carrier to subsidize the cost of calls from LEC's customers to the paging carrier's customers, when completing such calls requires the LEC to transport them from one of its local calling areas to another of its local calling area." [5] The

---

3. Refers to interconnection agreements between Qwest and other telecommunication carriers that have been discovered.

4. *Metrocall v. Southwestern Bell Telephone Company, Memorandum Opinion and Order,* 2001 WL 1153937 at *3, 16 FCC Rcd 18,123 at ¶ 9 (Oct. 2,

2001), *reconsid. denied,* 2002 WL 398293 at *1, 17 FCC Rcd 4781 at ¶ 2 (Mar. 15, 2002).

5. *Mountain Communications, Inc. v. Qwest Corporation, Memorandum Opinion and Order,* 2002 WL 130892 at **1, 2, 17 FCC Rcd 2091 at ¶¶ 1, 8 (Feb. 4, 2002), *reconsid. denied,* 17 FCC Rcd 15135, 2002 WL 1677642.

Commission explained that, "Qwest may charge its customers for long-distance calls from its Magic Valley or eastern Idaho local calling regions to a Pager located in Boise." Thus, Qwest may appropriately charge the Pagers for the use of these wide area calling services and facilities.

6. *Calculations of the Refunds:* With the exception of calculating additional interest attributable to the passage of time, the Commission found "that Qwest's evidence [regarding the calculation of the refunds] was clearly superior to the evidence offered by the Pagers. We find Qwest's evidence to be much more detailed, complete, and persuasive than the evidence offered by the Pagers." The Commission directed Qwest to update its calculation of the refunds due each Pager through July 31, 2002. The Commission ordered that Qwest provide these updated calculations to the Commission and the parties no later than July 31, 2002. Qwest complied with this directive and filed its updated calculation of the refunds on July 30, 2002.

On August 14, 2002, Qwest filed a notice stating that it had issued refunds in the form of billing credits to the three Pagers. Qwest's notice stated that it credited the Pagers the following amounts:

| Pager | Credit Amount |
| --- | --- |
| PageData | $45,742 |
| Radio Paging | $42,105 |
| Tel-Car | $31,997 |

On August 7, 2002, the Pagers filed a Petition for Reconsideration, raising more than 35 points of contention. The Pagers requested that the Commission's findings contained in Order No. 29064 be amended to conform to the arguments contained in their Petition for Reconsideration, the Supplement to the Pagers' Exceptions, and the Request to Supplement Exceptions. Qwest answered the Petition for Reconsideration, contending that the Pagers have had several opportunities to address every conceivable issue. *Id.* Qwest argues that the decisions issued after the *TSR Wireless* Order have clearly demonstrated that the Pagers are not entitled to all facilities and services for free. On November 1, 2002, the Commission issued its final Order on Reconsideration (Order No. 29140),

determining that refunds were not due for: (1) non-paging services and facilities; (2) "transit traffic" from non-Qwest carriers; and (3) "wide area calling" services and facilities provided by Qwest that effectively allowed Qwest customers to call the Pagers toll-free. The Commission affirmed its prior order but did increase the amount of billing credit owed each Pager. The Pagers appealed, and proceedings were stayed when the parties agreed to participate in the appellate settlement process. Following unsuccessful negotiations, the Court reinstated the appeal.

On February 13, 2004, the parties stipulated to suspend the appeal and temporarily remand this matter back to IPUC to consider a recent decision issued by the United States Court of Appeals for the District of Columbia Circuit, *Mountain Communications, Inc. v. FCC*, 355 F.3d 644 (D.C.Cir.2004). The parties asserted that remanding the matter would allow: (1) the Commission to reconsider its orders in light of the recent Circuit Court opinion, (2) the FCC to address the two telecommunication issues on remand from the Circuit Court, and (3) the parties another opportunity to settle the appeal. The Court suspended the appeal and remanded the matter back to the Commission. The negotiations to settle or narrow the issues on appeal were unsuccessful. In addition, the FCC had not issued any orders addressing the two telecommunications issues discussed in the *Mountain* opinion. *Id.* The Commission ordered briefs to be filed addressing the transit traffic and wide area calling issues.

Relying upon the Circuit Court's *Mountain* decision, the Commission issued Order No. 29555 and found that Qwest cannot charge the Pagers for traffic that originates on Qwest's network and is transported to the point of interconnection (POI) with the Pagers. The Commission further found that while Qwest cannot charge for wide area calling services or facilities, Section 51.703(b) does not prevent Qwest from charging its own end-user customers for calling a Pagers' POI located in a different local calling area. Pursuant to the Commissions directive, Qwest charged Tel–Car $3,909 for direct inward dialing (DID) wide area calling facilities

and PageData $10,607. In regards to transit traffic, the Commission gave Qwest a choice of either charging the Pagers for transit traffic and providing them calling information so that they may seek reimbursement or not charge the Pagers but instead charge the originating carrier. In response Qwest recalculated the refund amounts due to the Pagers as follows: (1) Radio Paging $57,467; (2) PageData $101,950; and (3) Tel–Car[6] $52,848.

Robert Ryder, on behalf of Radio Paging, and Joseph McNeal, on behalf of PageData, filed affidavits with the Commission indicating they are entitled to a full refund. Qwest moved to stay Order No. 29555 pending a decision on its request for reconsideration. The Pagers opposed.

On October 5, 2004, the Commission issued its final Reconsideration Order No. 29603 following the remand. The Commission determined that the Pagers were entitled to additional refunds from Qwest. The Commission observed that the refunds owed the Pagers may exceed any arrearages they may owe Qwest. Consequently, the Commission directed "Qwest to provide up-to-date calculations to confirm [whether] the refunds apportioned to each Pager ... exceed the amounts the Pagers owe Qwest." The Commission continued that if the Pagers' refunds exceed the amounts they owed Qwest, then Qwest shall issue cash reimbursement for the balances to PageData, Radio Paging, and Tel–Car's estate. On October 15, 2004, Qwest submitted its calculations in response to Order No. 29603. Rather than provide detailed calculations, Qwest asserted that both PageData and Radio Paging owed Qwest in excess of $200,000 and $20,000 respectively.

On November, 9, 2004, Qwest filed a notice of cross-appeal challenging the Commission's determination that: (1) refunds or credit shall be given for use in relation to transit traffic, and (2) failing to provide guidance as to when credits or refunds are proper.

In Order No. 29666 the Commission found that Qwest's calculations did not explicitly confirm the Commission's calculation of refunds. Because Qwest did not provide detailed calculations regarding any arrearages that the Pagers owe Qwest, the Commission found Qwest's calculations to be non-responsive to its order. Upon a request by both parties, the Commission directed the parties to meet once again to exchange data and attempt to settle their differences, laying out the following parameters: (1) the refunds and arrearages should generally pertain to the undisputed refund periods previously identified and end on the effective dates of their respective interconnection agreements, and (2) without addressing the merits of what services may be included in the alleged arrearages, Qwest should provide detailed calculations pertaining to what services are subjects of any claimed arrearages. The issues present in this appeal are: (1) did the Commission properly determine the amount of refunds owed to the Pagers, (2) did the Commission err when it determined that Qwest could not charge for transit traffic, (3) did the Commission impose the correct interest rate, (4) was the Commission arbitrary and capricious when it ordered Qwest to refund to the Pagers in cash in excess of any arrearages the Pagers owed, (5) what, if any, attorney fees should be awarded on appeal?

## II.

### STANDARD OF REVIEW

"Jurisdiction to review an appeal from an order of the Commission is provided by Article V, Section 9 of the Idaho Constitution." *In re Jay Hulet's Complaint Regarding Idaho Power Company's Irrigation Buy–Back Program,* 138 Idaho 476, 478, 65 P.3d 498, 500 (2003). The Idaho Code limits the scope of review:

No new or additional evidence may be introduced in the Supreme Court, but the appeal shall be heard on the record of the commission as certified by it. The review on appeal shall not be extended further than to determine whether the commission has regularly pursued its authority, including a determination of whether the order appealed from violates any right of the

6. Tel–Car became Chapter 7 debtor effective as of January 2002.

924

appellant under the constitution of the United States or of the state of Idaho. I.C. § 61–629. "Review of IPUC decisions as to questions of law is limited to a determination of whether the IPUC has regularly pursued its authority and whether the constitutional rights of the appellant have been violated." *Rosebud Enterprises, Inc. v. Idaho Public Utilities Comm'n,* 128 Idaho 624, 631, 917 P.2d 781, 788 (1996)(citing *A.W. Brown Co., Inc. v. Idaho Power Co.,* 121 Idaho 812, 828 P.2d 841 (1992)). "Regarding questions of fact, the Court ruled that 'where the Commission's findings are supported by substantial, competent evidence, this Court must affirm those findings' and 'is obligated to affirm its decision.'" *Rosebud,* 128 Idaho at 631, 917 P.2d at 788 (quoting *Empire Lumber Co. v. Washington Water Power Co.,* 114 Idaho 191, 755 P.2d 1229 (1987), *cert. denied,* 488 U.S. 892, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988)). "In reviewing findings of fact we will sustain a Commission's determination unless it appears that the clear weight of the evidence is against its conclusion or that the evidence is strong and persuasive that the Commission abused its discretion." *Rosebud,* 128 Idaho at 631, 917 P.2d at 788 (quoting *Utah–Idaho Sugar Co. v. Intermountain Gas Co.,* 100 Idaho 368, 376, 597 P.2d 1058, 1066 (1979)). "The burden is on the party challenging the Commission's findings to show that they are unsupported by the evidence." *Hulet,* 138 Idaho at 478, 65 P.3d at 500.

## III.

### THE COMMISSION PROPERLY DETERMINED THE AMOUNT OF REFUNDS OWED TO THE PAGERS

Each of the Pagers contends that the Commission erred in determining the amount of refund owed by Qwest.

### A. The Commission properly determined PageData's refund.

PageData argues that the Commission erred by: (1) approving Qwest's peremptory exclusion of private lines from the reimbursement requirement, (2) allowing Qwest to charge for private lines as a wide area calling service, (3) refusing to require Qwest to bear the cost of transporting paging traffic to the Boise paging terminal, and (4) placing the burden of proof on PageData. Qwest maintains that facilities are free to the pager only to the extent the facilities are necessary for interconnection and use to carry LEC-originated paging traffic.

In the Credit Phase of the case, PageData initially asked for a refund in the amount of $240,756.03. Page Data's initial refund request reflected a combined total for both InterPage ($188,473.56) and Page Data ($52,282.47). Subsequently, on remand before the Commission, PageData asserted that it was entitled to an even greater combined refund of $245,628.51 *plus* $14,926.80 "for the T–1 lines and the frame relay"—for a grand total of $260,555.31.

The majority of the refund requested comes from InterPage [7] ("PageData"). The Commission held that InterPage's refund calculations were unreasonable, the evidence in support was not as credible as that supplied by Qwest, the request included charges for non-paging services and facilities, and case law supports the finding that charges for facilities used by PageData to connect parts of their network on their side of the POIs are costs appropriately borne by PageData.

Contrary to PageData's assertion, the Commission did not reject the refund request on the basis that the services charged were for wide area calling services. The main basis for the Commission's decision resulted from its finding that an LEC, in this case Qwest, can charge for facilities ordered by the paging company to connect points on its side of the network. *See Qwest Corp. v. FCC,* 252 F.3d 462, 468 (D.C.Cir.2001); *TSR Wireless, LLC v. US West Communications, Inc.,* 2000 WL 796763 at *3, 15 FCCR 11,166 n. 70 (2000). (It has been repeatedly held that the paging carrier would be responsible for paying charges for facilities ordered from the LEC to connect points *on the paging carrier's side of* the point of interconnection)(emphasis added). This then becomes a

---

7. InterPage was purchased by Mr. McNeal, owner of PageData.

factual inquiry to determine on whose network these private lines lie.

The Commission found that the private lines were part of PageData's network. The question is whether the Commission had substantial and competent evidence to support this conclusion. PageData argues that the leased lines are part of Qwest's network maintaining that the leased lines and POTS lines and other facilities located in Idaho Falls, Pocatello, Twin Falls, and the outlying areas are on Qwest's side of the Boise paging terminal, not on the Pagers' side. According to PageData, those lines and facilities feed the point of interconnection in Boise and that when a call comes to the Boise paging terminal, the call is routed out through PageData's system and PageData is responsible for all facilities and costs incurred from that point on.

The evidence does not support PageData's contention. McNeal testified that PageData had leased lines that connected its paging terminals (POIs) to Boise. These leased lines, as evidenced by a letter addressed to Qwest, are part of PageData's network:

*We are currently using a <u>private network</u>* where we have leased lines from US West (point to point 2– and 4–wire circuits) connected together with Motorola UDS v.34 modems. These modems and paging terminals are currently located in Idaho Falls (854 Lindsey Blvd, KUPI address); Pocatello (656 S. 2nd Ave, Idaho Power Address); Twin Falls (273 Blue Lakes Blvd, Idaho Power Address); Meridian (220 E. Fairview, Tel–Car address); and Boise at 6610 Overland Rd. *The network sends TNPP packets between the paging terminals* (emphasis added).

Further, Fraser, Qwest's expert, testified that a "private line service is ordered from premise to premise, so from one PageData premise to another PageData premise," supporting the finding that these private lines are part of PageData's network. The burden is on the party challenging the Commission's findings to show that they are unsupported by the evidence. *Hulet,* 138 Idaho at 478, 65 P.3d at 500. This burden has not been met.

PageData argues, however, that even if it is determined that the private lines are part

of its network, the sole reason for having this network and incurring the charges was because Qwest failed to provide a single point of interconnection as obligated under the Telecommunications Act of 1996. The burden is on Qwest to show that a single point of interconnection is not technically feasible upon request:

The plain language requires local exchange carriers to permit interconnection at any technically feasible point within the carrier's network. *An incumbent carrier denying a request for interconnection at a particular point <u>must prove</u> interconnection at that point is not technically feasible.*

*US West Communications, Inc. v. Jennings,* 304 F.3d 950, 960–61 (9th Cir.2002)(quoting *US West Communications v. MFS Intelenet, Inc.,* 193 F.3d 1112, 1124 (9th Cir.1999)); 47 C.F.R. § 51.305(e)(emphasis added). Page-Data maintains that it requested a single point of interconnection through Boise in a letter addressed August 29, 1998. Qwest did not interpret the letter as such a request. If the August 29, 1998, letter was a request for a single point of interconnection at Boise, the burden was on Qwest to demonstrate why that request was not technically feasible. The Commission did not explicitly state in its orders its finding in this regard. However, the Commissioner acknowledged the applicable law and the effect of that law. It seems clear that the Commission did not treat the letter as such a request. Certainly that letter does not explicitly state such a request or use words that lead to the conclusion the request was being made. The Commission did not err in its approach.

The Commission's findings are supported by substantial, competent evidence. The Commission's decision not to award further reimbursement to PageData is affirmed.

**B. Ryder is not entitled to an additional refund in the form of interest because a close reading of the Commission's Order demonstrates the award already contained interest.**

Ryder alleges that he is entitled to additional recovery in the form of interest. Nei-

ther the IPUC nor Qwest responds to this issue.

After reaffirming its finding that Qwest presented better evidence in regard to billing and payment information the Commission ordered the following for Ryder and his paging company, Radio Paging, "[w]e adopt Qwest's calculations and further find that Radio Paging's appropriate total refund *with interest* as of July 1, 2003 is $57,416. We also observe this amount is comparable to Radio Paging's request of $57,309.16 (without interest)." (Emphasis added.) Although the Commission notes the two calculations are comparable, it is evident the Commission recognized that Radio Paging's request did not include interest, while Qwest's calculations did include interest. Recognizing that Qwest provided the better evidence, the Commission adopted Qwest's figures. According to the Commission, the only additional amount owed is the interest for July 2004, "[g]iven the fact the parties requested that the remand be continued until August 2, we further find it is appropriate for Qwest to include one additional month of interest up to August 1, 2004." The Commission determined the proper award to Ryder and Radio Paging to be $57,416, which includes interest. The only additional interest owed is for the month of July 2004.

## IV.

**THE COMMISSION PROPERLY DETERMINED THAT QWEST OWED ADDITIONAL REFUNDS FOR TRANSIT TRAFFIC BECAUSE, PURSUANT TO THE RECENT *MOUNTAIN* DECISION, IN ORDER TO CHARGE THE PAGERS QWEST NEEDED TO PROVIDE THEM WITH CALLING DATA FROM WHICH THE PAGERS COULD GET REIMBURSED, FAILURE TO SUPPLY SUCH DATA PRECLUDES QWEST FROM CHARGING FOR TRANSIT TRAFFIC**

▪ Based on the recent decision in *Mountain*, the Commission determined that Qwest could either charge the Pagers and provide calling information so that they may seek reimbursement or it could charge the originating carrier. *Mountain Communications, Inc. v. FCC*, 355 F.3d 644, 649 (D.C.Cir.2004). Since Qwest admitted that the calling data for transit traffic does not exist, the Commission had one choice—order Qwest to refund the transit traffic charges to the Pagers. Qwest argues that the Commission erred in ruling that it must credit the Pagers for transit traffic, offering the following support for its contention: (1) the Pagers never asserted that Qwest must supply originating calling number data as a condition to charging them for the dedicated paging facility to the extent such facility carried third-party traffic, (2) the hearing officer rejected the contention that Qwest had the duty to provide Pagers with billing information, and (3) even if *Mountain* gives rise to a change in law that was not the law at that time the Pagers were charged.

Qwest's arguments fail in light of the recent decision in *Mountain*. First, the Pagers' position has consistently been that they are entitled to a refund for the transit traffic charges. Once the payment is contested, Qwest must either provide the originating calling number data or reimburse the charges collected. *See Pace v. Hymas*, 111 Idaho 581, 585, 726 P.2d 693, 697 (1986)(during the course of litigation the burden of proof may shift between the parties). Second, the hearing officer did not have the benefit of the *Mountain* decision at the time he made his determinations. Finally, Qwest provides no authority for the proposition that the Court can allow these charges since that was the "law prior to" *Mountain* and when the charges were incurred. *See State v. Zichko*, 129 Idaho 259, 263, 923 P.2d 966, 970 (1996)("A party waives an issue cited on appeal if either authority *or* argument is lacking, not just if both are lacking.")(emphasis added). Notably, Qwest stipulated to a stay in the proceedings so the Commission could take into consideration the *Mountain* decision.

The Commission's decision ordering Qwest to refund the transit traffic costs is affirmed. The Commission regularly pursued its authority in accordance with federal law and

the facts show that Qwest did not possess the calling data to supply the Pagers.

## V.

### THE INTEREST RATE IMPOSED BY THE COMMISSION WAS IMPROPER

■ In Order No. 28626, the Commission declined to apply the 12% interest rate proposed by the Pagers. It applied the interest rate in accordance with IDAPA 31.41.01.106.01: 6% by analogy for amounts accumulated between the years 1996 and 1998, and 5% for amounts accumulated between the years 1998 and 1999. The Pagers maintain that the Commission applied the wrong interest rate to their refunds. The Commission maintains that it was proper to follow the long established practice of applying the T–Bill interest rate.

Idaho Code § 28–22–104(1) provides that "[w]hen there is no express contract in writing fixing a different rate of interest, interest is allowed at the rate of twelve cents (12¢) on the hundred by the year." However, subsection (1) continues and states the 12% interest rate is to apply *on the following:*

1. Money due by express contract.
2. Money after the same becomes due.
3. Money lent.
4. Money received to the use of another and retained beyond a reasonable time without the owner's consent, express or implied.
5. Money due on the settlement of mutual accounts from the date the balance is ascertained.
6. Money due upon open accounts after three (3) months from the date of the last item.

Subsection(s)(2), (5), or (6), are arguably applicable if the Commission's use of the T–Bill interest rate is not proper.

I.C. § 62–616 states, in pertinent part, "[t]he commission may, by order, render its decision granting or denying in whole or in part the subscriber's complaint *or providing such other relief as is reasonable based on the evidence presented* to the commission at the hearing" (emphasis added). This provision is not broad enough to permit the Commission to create an interest rate or apply the IDAPA 31.41.01.106.01 rate. The case is remanded for application of a proper interest rate.

## VI.

### THE COMMISSION WAS NOT ARBITRARY AND CAPRICIOUS WHEN IT ORDERED QWEST TO REFUND TO THE PAGERS IN CASH IN EXCESS OF ANY ARREARAGES THEY OWED

■ The Commission ordered that "[i]f the refunds afforded to PageData and Radio Paging exceed the amounts the Pagers owe Qwest, then Qwest shall provide them with cash reimbursements within 21 days of the service date of this Order." Qwest argues that the Commission originally ordered reimbursements to be applied as billing credits and this departure from its previous rulings is arbitrary, capricious, and highly prejudicial to Qwest. Qwest also argues that there was no evidence presented regarding overall account balances during the recovery period, so there is no evidence from which the Commission or the Court could determine whether credits ordered exceeded the amounts owed. Finally, Qwest maintains that the Order is further arbitrary and capricious because the Commission offered no explanation for rejecting its previous rulings.

The Commission has the power and authority to resolve complaints through an Order rendering its decision as is reasonable based on the evidence presented:

The commission shall have the authority to investigate and resolve complaints made by subscribers to telecommunication services which are subject to the provisions of this chapter which concern the quality and availability of local exchange service, or whether price and conditions of service are in conformance with filed tariffs or price lists, deposit requirements for such service or disconnection of such service by telephone corporations subject to the provisions of this chapter. The commission may, by order, render its decision granting

or denying in whole or in part the subscriber's complaint or providing such other relief as is reasonable based on the evidence presented to the commission at the hearing. Any final order of the commission entered pursuant to this section may be enforced against any telephone corporation by an affected person or by the commission.

I.C. § 62–616.

The Commission acted within its authority when it determined that the Pagers are not entitled to all of their reimbursements in cash. In particular, the Commission noted that:

At least two pagers [Radio Paging and PageData] acknowledged they stopped paying their paging bills from Qwest. This fact coupled with the fact that they sought much larger refunds than the Commission eventually ordered, leads us to *infer* that the credits may not exceed the arrearages. *If this is the case,* it would be unreasonable to require cash reimbursements.

Order No. 29140 at 47 (emphasis added). In other words, if the refunds were less than the amounts the Pagers owed Qwest, it made little sense to issue cash reimbursements instead of billing credits.

The Pagers concentrate on the bills that they have already paid. However, the reason the Commission determined that all the money paid is not immediately refundable is because of the bills the Pagers stopped paying. If those bills contained valid charges, then the money to be reimbursed to the Pagers shall be deducted by the amount of those valid charges. The Commission did not prohibit cash from being returned to the Pagers, but this will occur only after any valid arrearages have been paid. Depending on the arrearages the Pagers may in fact get all their reimbursements back in cash.

Qwest contests the Commission's ruling in regard to cash reimbursements as arbitrary and capricious because there was no evidence before the Commission to determine whether the reimbursement was going to exceed the arrearages, and the Commission provided no basis for its decision. Qwest misinterpreted the nature of the Orders. The Commission

recognized that it was possible that the refunds due to the Pagers might exceed the amounts the Pagers owe Qwest because the refunds have substantially increased from those originally calculated from Qwest. In a later Order, the Commission provided reasoning for its order to reimburse in cash in excess of the amounts owed to Qwest:

A review of our prior Orders is helpful in examining the issue of billing credits or cash reimbursements. In the first phase (the Liability Phase) of this case, the Commission determined that the Pagers were "entitled to *a billing credit or reimbursement* for services and facilities ..." Order No. 28601 at 12 (emphasis added). After Order No. 28601 was issued in December 2000, the Pagers filed a Petition to Amend that Order. Among other things, the Pagers requested the Commission strike the words "a billing credit or" from the ordering paragraphs. The Commission rejected this request. Order No. 28626 at 2.

In the second phase (the Credit Phase) of this case, the Pagers again raised the issue of cash reimbursements. Conversely, if the refunds were greater than the amounts owed Qwest, cash reimbursements for the balances would be appropriate.

Initially, the reason the Commission ordered a credit rather than an outright cash refund was because there may have been some arrearages due to the Pagers' decision to stop paying their bills. At the time of the Order the Commission believed that the arrearages would be more than the reimbursement and a cash reimbursement would be unreasonable. Conversely, as noted by the Commission, it can be inferred that if the reimbursement were to be more than the arrearages, then it would no longer be unreasonable to refund in cash. The Commission expressly stated this in a later Order based on the Commission's belief that with the additional refunds due for transit traffic and wide area calling, there was a likely chance ·that the reimbursement would be more than the arrearages. Lastly, although the Commission did not possess the evidence necessary to make this determination, Qwest did, and this is the reason the Commission or-

dered Qwest to provide data to the Commission:

> Although Qwest has filed a Cross Appeal, most if not all of the issues identified in its Cross Appeal relate to the remand issues of wide area calling and transit traffic. Consequently, we direct Qwest to provide up-to-date calculations to confirm that the refunds apportioned to each Pager: (1) as of November 2002 and (2) for the additional refunds for wide area calling and transit traffic (with the "800" adjustment), exceed the amounts the Pagers owe Qwest. _We order Qwest to provide this data to the Commission within ten (10) days of the service date of this Order. We encourage the Parties to meet informally to review the data/calculations before it is filed with the Commission._ If the Pagers' refunds exceed the amounts they owed Qwest, then Qwest shall issue cash reimbursements for the balances to PageData, Radio Paging and Tel–Car's estate within fourteen (14) days of the service date of this Order (emphasis added).

Based on the new data that Qwest was to prepare, if the Pagers' refunds exceeded the arrearages, then Qwest was to issue cash reimbursements. The decision of the Commission is neither arbitrary nor capricious. _See Rosebud Enterprises, Inc. v. Idaho Public Utilities Comm'n,_ 128 Idaho 609, 618, 917 P.2d 766, 775 (1996).

## VII.

### ATTORNEY FEES ON APPEAL

The Pagers request attorney fees pursuant to I.C. 12–120(3). Qwest also requests attorney fees pursuant to I.C. 12–120(3).

 Idaho Code 12–120(3) authorizes the award of attorney fees to the prevailing party when the action is based on a commercial transaction. The statute defines commercial transactions as "all transactions except transactions for personal or household purposes."

> [T]he award of attorney fees is not warranted every time a commercial transaction is remotely connected with the case. Rather, the test is whether the commercial transaction comprises the gravamen of the

lawsuit. Attorneys fees are not appropriate under I.C. 12–120(3) unless the commercial transaction is integral to the claim, and constitutes the basis upon which the party is attempting to recover.

_Sowards v. Rathbun,_ 134 Idaho 702, 708, 8 P.3d 1245, 1251 (2000)(quoting, _Brower v. E.I. DuPont De Nemours and Co.,_ 117 Idaho 780, 784, 792 P.2d 345, 349 (1990)).

 Attorney fees cannot be collected under I.C. 12–120(3) against the IPUC where the IPUC did not engage in a commercial transaction. _See Owner–Operator Independent Drivers Assn., Inc. v. Idaho Public Utilities Commn.,_ 125 Idaho 401, 407–09, 871 P.2d 818, 824–26 (1994)(the collection of fees, although commercial, cannot be classified as a transaction). In this case, the IPUC did not engage in a commercial transaction with the parties, but instead is a party to this action due to its role as trier of fact.

The parties have prevailed on some issues and lost on others. No attorney fees among the parties are appropriate.

## VIII.

### CONCLUSION

The decision of the Commission is affirmed except as to the interest rate applied to the amount owed the Pagers. The case is remanded for recalculation of interest. The parties have both prevailed and lost on issues asserted. No costs or attorney fees are awarded.

Justice EISMANN attended oral argument but did not participate in the opinion.

Justice BURDICK and Justices Pro Tem KIDWELL and WILLIAMSON concur.